CRAKER, Plaintiff in error, v. STATE, Defendant in error.

*No. State 132.   Submitted December 2, 1974.—Decided
December 20, 1974.*
(Also reported in 223 N. W. 2d 872.)

For the plaintiff in error the cause was submitted on the brief of *Howard B. Eisenberg,* state public defender, and *Ronald L. Brandt,* assistant state public defender.

For the defendant in error the cause was submitted on the brief of *Robert W. Warren,* attorney general, and *Christine M. Wiseman,* assistant attorney general.

BEILFUSS, J.   On appeal, the defendant contends that he should be allowed to withdraw his plea of guilty because: (1) It was involuntarily made; and (2) the factual basis to support the plea of guilty to the first-degree murder charge was inadequate.

With respect to the first issue, this court held in *Ernst v. State* (1969), 43 Wis. 2d 661, 666, 170 N. W. 2d 713, that a defendant should be permitted to withdraw his plea of guilty if he can show by clear and convincing evidence that the plea was involuntary. *See also: State v. Reppin* (1967), 35 Wis. 2d 377, 385, 151 N. W. 2d 9. This court also held in *Ernst,* page 672, that the trial judge must personally question the defendant and expose his state of mind on the record. The record must:

". . . reveal that the plea was voluntary and that the defendant understood both the charge and its consequences."

*See also: McCarthy v. United States* (1969), 394 U. S. 459, 89 Sup. Ct. 1166, 22 L. Ed. 2d 418. Further, as stated in *State ex rel. White v. Gray* (1973), 57 Wis. 2d 17, 22, 203 N. W. 2d 638, "The plea bargaining process must be opened to judicial scrutiny. It is essential that a record of the nature of the bargain should be made."

See also: *Austin v. State* (1971), 49 Wis. 2d 727, 183 N. W. 2d 56.

In this case the record contains both the terms of the bargain and the transcript of the trial court's interrogation of the defendant to ascertain that he understood the terms and ramifications of the agreement and that his plea of guilty was voluntarily made.

The defendant contends that the plea of guilty was not voluntarily made because he was held, pending trial, under an allegedly inordinately high bail and because he was subject to religious scruples and family pressure which prevailed upon him to plead guilty.

With respect to the amount of the bail, the defendant does not suggest that this court review its reasonableness, but asserts that the impossibility of his making bail ". . . made it much harder for him to communicate with his family, as well as with his attorney. . . Defendant made the decision to accept the bargain under duress, in a situation totally foreign to what he had previously experienced in life." An examination of the record reveals the facts are not sufficient to support this allegation. At the hearing on defendant's motion to withdraw his guilty plea, he testified as follows concerning the effect of his incarceration on his ability to confer with his counsel:

"*Q.* Do you know of any occasion when your attorneys desired to talk to you that they were prevented from talking to you by the jailers?
"*A.* No.
"*Q.* Do you know of any occasion when you wanted to talk to your attorneys and were prevented from talking to your attorneys by the jailers?
"*A.* No."

Likewise, the record reveals quite clearly that the defendant had ample opportunity to, and did, confer frequently with members of his family. In fact, it is

curiously paradoxical that the defendant contends he was unable to communicate with his family, in view of his allegation that "his family was pressuring him to plead guilty."

With regard to the allegedly coercive effects of moral scruples and family pressure, the combined effect of which was supposedly to compel him to plead guilty only because of his moral culpability and not because of his legal guilt, a comparable situation appears in *Drake v. State* (1969), 45 Wis. 2d 226, 233, 172 N. W. 2d 664. In that case, the defendant alleged that his plea of guilty was coerced in that it was made to protect his wife from criminal prosecution. This court upheld the trial court's refusal to allow the plea to be withdrawn, stating at page 233:

". . . It is not unusual that participants in criminal enterprises elect not to name their coconspirators. In the organized underworld, such refusal to involve others underlies the gangland penalty of Omerta, or Death to the Informer. To recognize this attitude is not to applaud or encourage it. However, such refusal to involve others, even those equally guilty, cannot be described as coercive in any sense of that word. If it is, it is a self-imposed 'coercive element,' which does not weaken the voluntary and knowledgeable aspect of an act based upon it."

In *Seybold v. State* (1973), 61 Wis. 2d 227, 233, 234, 212 N. W. 2d 146, the defendant contended that his guilty plea was involuntary because it was given in exchange for a promise that his wife, a codefendant, would be granted probation. This court stated:

" 'As a matter of fact a fair interpretation of Seybold's language would support the premise that most of the coercion involved in arriving at the decision to plead guilty was applied by his wife and another female who "both burst into tears" when Seybold was reluctant to accept the "deal." '
". . ."

"As recognized in *Rahhal v. State* (1971), 52 Wis. 2d 144, 187 N. W. 2d 800, many guilty pleas have some element of compulsion but this is not to say that they are necessarily involuntary. In *Rahhal, supra,* pages 151, 152, it was said:

" '. . . The distinction between a motivation which induces and a force which compels the human mind to act must always be kept in focus. When the defendant is not given a fair or reasonable alternative to choose from, the choice is legally coerced. . . .'

"In *Drake v. State* (1969), 45 Wis. 2d 226, 233, 172 N. W. 2d 664, this court said the defendant's subjective desire to plead guilty in order to avoid the implication of his wife in his jail break was a self-imposed coercive element which did not destroy the voluntariness of his plea."

So too in this case. The defendant's religious beliefs regarding the merits of confessing one's wrongdoing and his desire to mollify his family or give in to their desires are "self-imposed coercive elements" and do not vitiate the voluntary nature of the defendant's guilty plea.

Furthermore, any allegation that the defendant was "confused" at the time he entered his plea is dispelled by the trial court's observation:

". . . Now, I'm amazed to hear any reference today to the emotional state of the defendant at the time of the sentencing. I had occasion to see him outside of a full scale trial more times than a Court would ordinarily see a defendant. I was impressed with his friendly manner, with his general intelligence, his general demeanor; and I have, as I went along, learned something of his background, that he had been a good athlete, that he had completed high school, that he had been a corpsman in the military service, a medical corpsman. He at all times was responsive, displayed remarkable poise and friendliness. . . ."

The defendant's final contention with respect to the voluntariness, *vel non,* of his plea is that the bargain was "illusory" in that he allegedly had nothing to gain by accepting. This argument is based on the assumption

that there was insufficient evidence to support the two charges of attempted murder, and therefore the defendant gained nothing by having the two charges dismissed in exchange for his plea since he could not have been convicted anyway.

Specifically, the defendant alleges that there was no evidence that the defendant intended to kill Mr. and Mrs. Britten. With respect to the question of intent, " 'The law presumes that a person intends the natural and probable consequences of his own acts . . . .' " *Gelhaar v. State* (1969), 41 Wis. 2d 230, 243, 163 N. W. 2d 609, certiorari denied (1970), 399 U. S. 929, 90 Sup. Ct. 2250, 26 L. Ed. 2d 797; *State v. Carlson* (1958), 5 Wis. 2d 595, 604, 93 N. W. 2d 354. In this case, there was testimony that the defendant had repeatedly threatened to shoot Mrs. Britten and on the night of the murder had threatened to hurt her. Mr. Britten testified, describing the shooting, "Well, first, Marie was hit. She was hit twice, and then he turned on my wife." Mrs. Britten was shot four times. There can be no question but that such evidence reveals the requisite intent to murder Mrs. Britten.

As regards the defendant's intent to murder Mr. Britten, there is some conflict in the testimony. Mr. Britten testified at one point:

"Q. . . . This gun was never pointed at you, but you leaned over to protect your wife?
"A. Yes."

At another point, however, he testifed after stating his wife had been shot four times:

"Q. Were there other shots fired. . . ?
"A. Yes, and that's when the last two shots were fired.
"Q. And were they fired in your, generally in your direction?
"A. Yes, they were fired at me. Yes.
"Q. Were you struck in any way?
"A. I was hit in the shoulder."

Even if this evidence could not support a charge of attempted first-degree murder, it would undoubtedly sup-

port a charge of reckless use of a weapon contrary to sec. 941.20, Stats. In any event, both attempted murder charges were dismissed. Even if convicted on only one, the defendant could have received an additional thirty-year sentence and his parole possibilities could have been significantly postponed. Under no reasonable view can the defendant's plea bargain be deemed "illusory."

A plea of guilty must be knowingly and voluntarily made, and any showing to the contrary must be by clear and convincing evidence. *State v. Chabonian* (1972), 55 Wis. 2d 723, 728, 729, 201 N. W. 2d 25; *Gibson v. State* (1970), 47 Wis. 2d 810, 819, 820, 177 N. W. 2d 912. A motion to withdraw a guilty plea is directed to the sound discretion of the trial court. *Rahhal v. State, supra; Reiff v. State* (1969), 41 Wis. 2d 369, 372, 164 N. W. 2d 249. We conclude that the defendant has not made the requisite showing, and that the trial court did not abuse its discretion in denying defendant's motion.

As to the second issue, the defendant claims that the trial court erred in accepting his plea of guilty to the first-degree murder of Marie Helgeson because the evidence adduced prior to acceptance failed to establish a factual basis for the plea as required by sec. 971.08, Stats.,[1] and *Ernst v. State, supra.* Again, the specific contention is that the testimony failed to reveal the necessary intent.

---

[1] "971.08 **Pleas of guilty and no contest; withdrawal thereof.** (1) Before the court accepts a plea of guilty or no contest, it shall:

"(a) Address the defendant personally and determine that the plea is made voluntarily with understanding of the nature of the charge and the potential punishment if convicted; and

"(b) Make such inquiry as satisfies it that the defendant in fact committed the crime charged.

"(2) The court shall not permit the withdrawal of a plea of guilty or no contest later than 120 days after conviction.

"(3) Any plea of guilty which is not accepted by the court or which is subsequently permitted to be withdrawn shall not be used against the defendant in a subsequent action."

As noted above, an individual is presumed to intend the natural and probable consequences of his act. The testimony received indicated that Marie Helgeson was shot twice by the defendant at close range. Excerpts from the testimony of Mr. and Mrs. Britten reveal the volitional character of the defendant's conduct. According to Mrs. Britten:

"Q. And what, if anything, happened then? Where were you?
"A. I was standing by, by the door. Marie was in front of me.
"Q. Then what?
"A. And I don't know who opened the inside door, and in, Kenny was at the backdoor.
"Q. And who is Kenny?
"A. Craker.
"Q. Is that Kendall Lynn Craker?
"A. Yes.
"Q. And then what happened?
"A. And then he shot Marie; and then he shot me, and I fell to the floor.
"Q. How many times did he shoot Marie?
"A. I don't know for sure. I, once that I knew of.
"Q. And what, then what happened to her?
"A. She fell. And then he shot me, and that's when I fell to the floor."

According to Mr. Britten:

"Q. What happened?
"A. What happened? Well, first, Marie was hit. She was hit twice, and then he turned on my wife."

This testimony indicated a calculated, methodical shooting of first, Marie Helgeson, and then Mrs. Britten. Although the presumption that an individual intends the consequences of his acts is rebuttable, *Gelhaar, supra,* page 243, the defendant introduced no evidence whatsoever. It is clear that the necessary intent was established.

Even if there was no intent to kill Marie Helgeson however, there was clear evidence, as discussed above, of the

defendant's attempt to kill Mrs. Britten. Sec. 940.01, Stats., provides:

"**First-degree murder.** (1) Whoever causes the death of another human being with intent to kill that person *or another* shall be sentenced to life imprisonment.

"(2) In this chapter 'intent to kill' means the mental purpose to take the life of another human being." (Emphasis supplied.)

If the defendant had mistaken Marie Helgeson for Mrs. Britten, he would be guilty of first-degree murder nonetheless.

We conclude that the evidence amply established the defendant's guilt and the underlying basis for his plea.

*By the Court.*—Judgment and order affirmed.