STATE of Wisconsin, Plaintiff-Respondent,

v.

Timothy J. GOYETTE, Defendant-Appellant.†

Court of Appeals

*No. 2004AP2211–CR. Submitted on briefs August 10, 2005.*
*—Decided August 31, 2006.*

2006 WI App 178

(Also reported in 722 N.W.2d 731.)

† Petition to review denied 1/10/07.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Edward John Hunt* of *Hunt & Quinn S.C.*, Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Jeffrey J. Kassel*, assistant attorney general, and *Peggy A. Lautenschlager*, attorney general.

Before Lundsten, P.J., Dykman and Vergeront, JJ.

¶ 1. LUNDSTEN, P.J.  This is a plea withdrawal case involving a "package plea agreement." As used in this opinion, package plea agreement refers to a plea

agreement that is contingent on two or more codefendants all entering pleas according to the terms of the agreement. If one defendant does not enter a plea according to the agreement, the State is not bound by the agreement with respect to any of the defendants. Goyette entered pleas under a package plea agreement, was sentenced, and then moved for plea withdrawal. The circuit court denied the motion.

¶ 2. This appeal raises two issues. First, Goyette argues that the circuit court failed to comply with Wis. Stat. § 971.08(1) (2003–04)[1] during his plea hearing because the court failed to sufficiently inquire into the voluntariness of his plea in light of the package nature of the plea agreement. Thus, Goyette makes what is commonly referred to as a *Bangert* argument.[2] Goyette contends the circuit court erred when it concluded there was no *Bangert* violation. We do not, however, resolve Goyette's *Bangert* argument because it is moot. Under the particular facts in this case, regardless of the circuit court's *Bangert* ruling, Goyette obtained what he would have been entitled to had the court agreed with his *Bangert* argument.

¶ 3. Second, Goyette argues that the circuit court erred when it concluded that his pleas were not coerced, but instead voluntary. Most prominently, Goyette asserts the court wrongly concluded that, even if Goyette felt pressure in the sense that he "felt a psychological need to try to help [his] co-defendants" get the benefit of the package agreement, such pressure is not the type that renders a plea involuntary. We reject Goyette's

---

[1] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

[2] *State v. Bangert*, 131 Wis. 2d 246, 389 N.W.2d 12 (1986).

argument on this issue and, for additional reasons, affirm the circuit court's conclusion that Goyette's pleas were voluntary.

## Background

¶ 4.   On July 9, 2001, a young man named Jeffrey Smulick was beaten to death and his body was put in the Mississippi River. A few days later, a criminal complaint was issued charging Timothy Goyette and three other men with first-degree intentional homicide, as party to a crime. The complaint alleged that Goyette, Gary Gregory, Jonathan Coryell, and Colin Littlejohn all participated in severely beating Smulick, including punches and kicks to Smulick's head. Initially, the four men beat and left Smulick incapacitated near the river. Later, Coryell and Littlejohn returned to Smulick, who was still on the ground incapacitated, and one of these men struck Smulick's head with a rock. Littlejohn dragged Smulick's body into the river.

¶ 5.   The complaint further alleged that Goyette, Gregory, and Coryell were members of a "gang" called the Northside Bloods and that the beating was part of an "initiation" so that Littlejohn could be admitted into the gang. All four men gave statements to police admitting they participated in the initial beating. The primary conflict in the statements had to do with whose idea it was to go back to Smulick after the initial beating and whether Coryell or Littlejohn struck Smulick with the rock. The investigation produced medical evidence supporting the view that Smulick would have died from injuries inflicted during the initial beating in which Goyette admitted participating.

¶ 6.   Plea negotiations commenced sometime prior to February 7, 2002. The record contains a letter from the prosecutor dated February 7, referring to a prior

proposal, and making individual offers to Goyette, Coryell, and Gregory to reduce their charges from first-degree intentional homicide to first-degree reckless homicide.[3] A second written offer was made about a month later in a letter dated March 8, 2002. In this letter, the prosecutor offered to reduce the homicide charge to second-degree reckless homicide with a weapons enhancer, and added a charge of aggravated battery with a gang enhancer. This proposal was a "package" proposal. It was contingent on all three defendants pleading guilty according to the terms of the offer. Goyette's trial counsel testified that he kept Goyette apprised "every step along the way" and had "intelligent conversations about the facts of the case and how we wanted to attempt to resolve it."

¶ 7. About ten days later, on March 19, the defendants and their attorneys held a joint meeting. At this meeting, Goyette and Coryell said they would accept the March 8 offer. Gregory, however, was not willing to agree because he contended no weapon was involved in the initial beating and he would not agree to the weapons penalty enhancer. The attorneys negotiated further, and the prosecutor offered to drop the weapons enhancer, thus further reducing the total exposure of each man by five years. In a second joint meeting the same day, the attorneys all recommended that the men accept the agreement, and all three indicated acceptance. The portion of the agreement making it a package plea agreement provides:

> Each defendant understands that this plea agreement is contingent on each defendant pleading guilty pursuant to its terms. If any of the aforementioned

---

[3] Neither this letter nor subsequent joint plea negotiations included Littlejohn.

defendants does not plead guilty, this agreement is null and void with respect to the remaining defendants.

¶ 8.   A joint plea hearing with all three defendants was held the next day, March 20. At the hearing, the circuit court was fully apprised of the package nature of the plea agreement. During the plea colloquy, the court individually questioned the defendants regarding coercion. The court's exchange with Goyette on this topic was as follows:

> THE COURT:  Mr. Goyette, has anybody made any promises to you to get you to accept this plea agreement other than what's contained in the plea agreement itself?
>
> GOYETTE:  No, Your Honor.
>
> THE COURT:  Has anybody threatened you with anything in order to get you to enter into this plea agreement?
>
> GOYETTE:  No, Your Honor.
>
> THE COURT:  Has anybody pressured you, coerced you or forced you in any way to do this?
>
> GOYETTE:  No, Your Honor.

Thus, the court asked Goyette whether he had been pressured or coerced, but did not ask more specifically whether he had been pressured or coerced because of the package nature of the agreement.

¶ 9.   The court accepted the pleas of all three men and scheduled separate sentencing hearings. On July 17, 2002, Goyette was sentenced to twenty-five years of initial confinement and ten years of extended supervision, the maximum available. The court took into account Goyette's young age and dysfunctional family,

but also his dreadful juvenile record,[4] his pride in gang membership, and the senseless brutality of the homicide. Further, the court considered Goyette's repeated failure to reform his behavior despite participation in multiple treatment programs and various levels of supervision, including intensive tracking and placement at the Lincoln Hills detention facility. Indeed, as the court noted, Goyette was on electronic monitoring while he was beating Smulick.

¶ 10. At the time of the killing, Littlejohn was seventeen, Gregory was eighteen, Coryell was eighteen, and Goyette was fifteen. Goyette turned sixteen about ten days after the killing, was sixteen when he entered his guilty pleas, and was sentenced the day before his seventeenth birthday.

¶ 11. The first time Goyette complained that he felt pressure to enter his pleas was after he had been sentenced. Goyette filed a motion seeking plea withdrawal, alleging that the circuit court failed to comply at the plea hearing with its statutory duty to ascertain if Goyette's pleas were "voluntary in light of the 'all or nothing package.' " Thus, his motion asserted a *Bangert* violation. Goyette's motion asserted that, at the time of the pleas, he believed he was innocent of second-degree reckless homicide and that he pled under "pressure, haste and confusion." Goyette asserted that he did not have "sufficient time to confer privately with [his] own counsel" and that he "felt tremendous pressure from [his] attorney . . . to accept the deal." He asserted that he felt coerced "by the fact that if [he] did not enter the plea, [his] codefendants would not be able to reach plea

---

[4] Goyette has had over thirty contacts with police, including eleven arrests for disorderly conduct, two for battery, and two for criminal damage to property. He was adjudicated delinquent three times.

agreements." Goyette asserted that he did not want to speak up in the presence of his codefendants and would not have entered his pleas if he had received a separate plea hearing.

¶ 12. Without ruling on the merits of Goyette's claimed *Bangert* violation, the circuit court held an evidentiary hearing. The witnesses at this hearing were Goyette, Coryell, Gregory, and the trial attorneys for all three men.

¶ 13. Consistent with his plea withdrawal motion, Goyette's testimony consisted primarily of assertions that he "felt pressured" due to the package nature of the agreement and that he did not feel he had sufficient time to consider the agreement. Goyette testified that the reduced exposure to prison time provided by the plea agreement had no bearing on his decision. He contended the only reason he entered his pleas was attorney pressure and the pressure he felt to go along so that Coryell and Gregory would get the benefit of the plea agreement.

¶ 14. The circuit court denied Goyette's motion in an oral decision. The court concluded there was no *Bangert* violation, thus rejecting Goyette's assertion that the court's inquiry into the voluntariness of Goyette's pleas, in the package plea context, was insufficient. The court's factual findings, which Goyette does not challenge on appeal, included the following:

1. The first package plea offer containing the weapons enhancer was acceptable to Goyette and Coryell, but Gregory rejected it.

2. All three men were "happy" with the final package plea agreement and quickly accepted it.

3. The attorneys gave their opinions and advice, but did not pressure or coerce Goyette.

366

4. With the exception of the joint meetings, Goyette had no contact with Coryell or Gregory during plea negotiations.

5. Goyette was not threatened by anyone in any manner.

The circuit court reached the legal conclusion that, even if Goyette felt pressure for the reasons he described, such pressure did not render Goyette's pleas involuntary. The court explained:

> In this case, even assuming that [Goyette] felt pressure because [he] felt a psychological need to try to help [his] co-defendants to get this deal, it wasn't the type of force which compelled [him] to plead guilty such as to render [his] plea involuntary.

Accordingly, the circuit court denied Goyette's plea withdrawal motion.[5]

## *Discussion*

### *I. The Alleged Bangert Violation*

¶ 15. Goyette makes a *Bangert* argument. That is, he asserts that the circuit court failed to comply with WIS. STAT. § 971.08 or other court-mandated plea hear-

---

[5] The circuit court stated that it was not "necessarily accepting" Goyette's assertion about why he entered his pleas. The court found Goyette's testimony that he felt pressured not credible. In the circuit court's view, Goyette's after-the-fact assertion of pressure was a product of Goyette's dissatisfaction with his sentence. These factual findings, by themselves, might be sufficient to affirm the circuit court. However, as did the circuit court, we accept for argument's sake Goyette's assertion that he was motivated to enter his pleas because he wanted Coryell and Gregory to have the benefit of the package agreement. We therefore address the legal issues raised by that assertion.

ing procedures during his plea hearing.[6] More specifi-
cally, Goyette argues that the circuit court failed to
make a sufficient inquiry into the voluntariness of his
pleas in light of the fact that he was entering his pleas
as part of a package plea agreement. Thus, Goyette asks
us to add to the list of *Bangert* plea colloquy require-
ments.[7]

---

[6] WISCONSIN STAT. § 971.08 provides:

**Pleas of guilty and no contest; withdrawal thereof.**
**(1)** Before the court accepts a plea of guilty or no contest, it shall
do all of the following:

(a) Address the defendant personally and determine that the
plea is made voluntarily with understanding of the nature of the
charge and the potential punishment if convicted.

(b) Make such inquiry as satisfies it that the defendant in fact
committed the crime charged.

(c) Address the defendant personally and advise the defen-
dant as follows:   "If you are not a citizen of the United States of
America, you are advised that a plea of guilty or no contest for the
offense with which you are charged may result in deportation, the
exclusion from admission to this country or the denial of natural-
ization, under federal law."

(d) Inquire of the district attorney whether he or she has
complied with s. 971.095(2).

**(2)** If a court fails to advise a defendant as required by sub.
(1)(c) and a defendant later shows that the plea is likely to result
in the defendant's deportation, exclusion from admission to this
country or denial of naturalization, the court on the defendant's
motion shall vacate any applicable judgment against the defendant
and permit the defendant to withdraw the plea and enter another
plea. This subsection does not limit the ability to withdraw a plea
of guilty or no contest on any other grounds.

**(3)** Any plea of guilty which is not accepted by the court or
which is subsequently permitted to be withdrawn shall not be used
against the defendant in a subsequent action.

[7] Goyette is not clear about the plea colloquy requirement
he contends should be imposed on circuit courts in package plea

368

¶ 16. The circuit court resolved this *Bangert* issue against Goyette, concluding that no special inquiry into voluntariness is required in package plea situations. Goyette's appellate briefing does not persuade us that the circuit court's *Bangert* ruling was wrong, but we need not resolve that issue because the posture of this case makes Goyette's *Bangert* argument moot. Under the facts in this case, Goyette obtained what he would have been entitled to had he demonstrated a *Bangert* violation.

¶ 17. The purpose of filing a *Bangert* plea withdrawal motion is to obtain an evidentiary hearing at which the *State bears the burden* of producing evidence showing that, despite a defective plea colloquy, the defendant's plea was nonetheless knowing and voluntary. *State v. Bangert*, 131 Wis. 2d 246, 274–75, 389 N.W.2d 12 (1986).[8] In this case, the circuit court held an

---

situations. He complains that the circuit court here did not ask him whether he had been pressured by his codefendants into accepting the package agreement and did not ask whether he was entering his pleas to avoid jeopardizing the chances of his codefendants. As explained in the text, we do not reach the merits of Goyette's *Bangert* argument, but we note that if reaching this issue was necessary, Goyette does not present a cogent proposal for the questions courts must pose when accepting pleas as part of a package agreement.

[8] Under *Bangert*, if a defendant files a motion that (1) identifies a failure by the circuit court to comply with Wis. Stat. § 971.08 or a court-mandated plea hearing procedure, and (2) alleges that the defendant did not understand the information at issue, then the burden shifts to the State to show by clear and convincing evidence that the plea was knowingly and voluntarily entered. *Bangert*, 131 Wis. 2d at 274–75. Notably, the second *Bangert* prong is satisfied by a conclusory allegation that the defendant did not know or understand. *State v. Hampton*, 2004

evidentiary hearing, resolved factual disputes, and concluded, as a legal matter, that the type of pressure alleged by Goyette is not the type that causes a plea to be constitutionally involuntary.

¶ 18. The only difference between Goyette's evidentiary hearing and the one required by *Bangert* is that, under *Bangert*, the burden of proof shifts to the State. If a *Bangert* plea withdrawal hearing had been held, it would have been incumbent on the State to call necessary witnesses or otherwise meet its burden. Instead, at Goyette's hearing, Goyette called the witnesses and examined them first.[9]

---

WI 107, ¶ 57, 274 Wis. 2d 379, 683 N.W.2d 14. When a plea withdrawal motion is sufficient under *Bangert*, the circuit court must hold an evidentiary hearing at which the State has the burden of proving by clear and convincing evidence that the plea was knowingly entered. *State v. Brown*, 2006 WI 100, ¶¶ 36, 40, 293 Wis. 2d 594, 716 N.W.2d 906; *Bangert*, 131 Wis. 2d at 274–75.

[9] Goyette's hearing was the sort courts hold when they conclude that a plea withdrawal motion meets the *Nelson/Bentley* test. Regardless whether plea colloquies contain *Bangert* violations, defendants are entitled to post-sentencing plea withdrawal if they can show by clear and convincing evidence that their plea was not knowingly or voluntarily entered. *See State v. Reppin*, 35 Wis. 2d 377, 384–86, 151 N.W.2d 9 (1967); *State v. Giebel*, 198 Wis. 2d 207, 212, 541 N.W.2d 815 (Ct. App. 1995). When defendants file non-*Bangert* plea withdrawal motions requesting an evidentiary hearing, courts apply the *Nelson/Bentley* test to determine whether a hearing is required. The *Nelson/Bentley* test asks whether a motion alleges "facts sufficient to entitle the movant to relief, or presents only conclusory allegations, or if the record [otherwise] conclusively demonstrates that the defendant is not entitled to relief." *State v. Allen*, 2004 WI 106, ¶ 9, 274 Wis. 2d 568, 682 N.W.2d 433 (paraphrasing *Nelson v. State*, 54 Wis. 2d 489, 497, 195 N.W.2d 629 (1972), and *State v. Bentley*, 201 Wis. 2d 303, 309–10, 548

¶ 19. In some cases, shifting the burden of proof to the State, per *Bangert*, will affect the outcome of a plea withdrawal hearing. But here Goyette makes no attempt to explain how he was affected by the manner in which the circuit court conducted the plea withdrawal hearing. Stated differently, Goyette does not suggest how he was affected by the court's legal conclusion that no *Bangert* violation occurred. Goyette does not assert that any fact finding was affected, and his arguments have nothing to do with which party had the burden of proof at the hearing.

¶ 20. Our review of the hearing, the parties' arguments, and the circuit court's decision persuades us that the manner in which the hearing was conducted had no effect on the outcome. Goyette called the same two key witnesses that the State would have called, namely, Goyette and his trial counsel.[10] There is no reason to think that the substance of their testimony would have been different had they been called by the

N.W.2d 50 (1996)); *see also State v. Love*, 2005 WI 116, ¶ 26, 284 Wis. 2d 111, 700 N.W.2d 62. A motion requesting an evidentiary hearing must contain non-conclusory allegations, that is, allegations that " 'allow the reviewing court to meaningfully assess [the defendant's] claim.' " *Allen*, 274 Wis. 2d 568, ¶ 21 (quoting *Bentley*, 201 Wis. 2d at 314).

*Bangert* motions and *Nelson/Bentley* motions are not mutually exclusive. A defendant may, in the same physical motion, request a plea withdrawal hearing based on an alleged *Bangert* violation and, in the alternative, assert that a hearing must be held because the motion contains allegations that are sufficient under the *Nelson/Bentley* test.

[10] When a plea withdrawal hearing is held because a defendant makes a prima facie case under *Bangert*, the State may call and question the defendant and his counsel. *State v. Van Camp*, 213 Wis. 2d 131, 145, 569 N.W.2d 577 (1997) ("To meet its burden, the State may utilize any evidence which substantiates

State, rather than by Goyette. And, as we shall see, Goyette's testimony alone would have been sufficient to support the conclusion that the State met its burden of showing that Goyette's pleas were voluntary.

¶ 21.   Thus, we do not resolve Goyette's *Bangert* argument, and turn our attention to the voluntariness of Goyette's pleas.

## II. The "Package" Plea Agreement
### And The Voluntariness Of Goyette's Pleas

¶ 22.   Because Goyette does not challenge fact finding by the circuit court, we are left with the legal question whether the facts here entitle Goyette to plea withdrawal. As we explained in *State v. Hunter*, 2005 WI App 5, 278 Wis. 2d 419, 692 N.W.2d 256 (Ct. App. 2004):

> Although it is often said that whether to grant a post-sentence plea withdrawal motion is committed to the sound discretion of the trial court, when a defendant establishes a constitutional violation, the withdrawal of his or her plea becomes a matter of right and the trial court has "no discretion in the matter" to deny the motion. Whether a plea was voluntarily entered is a question of constitutional fact. We affirm the trial court's findings of evidentiary or historical facts unless they are clearly erroneous, but we independently determine whether the established facts constitute a constitutional violation that entitles a defendant to withdraw his or her plea.

*Id.*, ¶ 6 (citations omitted); *see also State v. Van Camp*, 213 Wis. 2d 131, 140, 569 N.W.2d 577 (1997).[11]

that the plea was knowingly and voluntarily made. The State may examine the defendant or defendant's counsel and may rely on the entire record . . . .").

[11] Although Goyette makes no frontal attack on fact finding by the circuit court, it is not always apparent whether Goyette assumes fact finding in a manner that supports the circuit

¶ 23. Goyette argues that the circuit court erred when it concluded that his pleas were voluntary. Although Goyette's primary focus is on the pressure he felt to go along with the agreement for the sake of his friends, Goyette points to additional related factors, such as his young age. Goyette asks us to consider these factors individually and collectively. We address each factor below and explain why they do not, either individually or in combination, persuade us that Goyette's pleas were involuntary.[12]

■

¶ 24. We first address Goyette's young age. Goyette stresses that he was sixteen years old when he entered his pleas and that he was the youngest of the three defendants. But Goyette does not point to evidence or findings showing that he was too young to understand the implications of his decision. Nor does he point to evidence or findings showing that he feared for his safety because Gregory and Coryell were two years

court's ultimate conclusion that his pleas were voluntary. In any event, our discussion views the evidence in a light most favorable to the circuit court's decision. More specifically, we assume facts, reasonably inferable from the record, in a manner that supports the circuit court's decision. *See State v. Leutenegger*, 2004 WI App 127, ¶ 30 n.7, 275 Wis. 2d 512, 685 N.W.2d 536; *see also State v. Hockings*, 86 Wis. 2d 709, 722, 273 N.W.2d 339 (1979); *State v. Wilks*, 117 Wis. 2d 495, 503, 345 N.W.2d 498 (Ct. App.), *aff'd,* 121 Wis. 2d 93, 358 N.W.2d 273 (1984).

[12] We note that the term "voluntary" is used both in the context of coercion issues, *e.g., Verser v. State*, 85 Wis. 2d 319, 330, 270 N.W.2d 241 (Ct. App. 1978), and in the context of understanding, *e.g., Van Camp*, 213 Wis. 2d at 145; *State v. Nichelson*, 220 Wis. 2d 214, 216, 582 N.W.2d 460 (Ct. App. 1998). In this decision, we use the term in the context of addressing whether Goyette's pleas were involuntary because they were coerced.

older. Goyette does not argue that fact finding by the circuit court was erroneous nor does he contend that the record contains evidence requiring a finding that he was unduly vulnerable because of his age. In short, Goyette offers nothing on which to base a holding that his pleas were involuntary, in whole or in part, because of his age.[13]

¶ 25. Goyette also asserts that he did not have "sufficient time" to meet with his attorney and consider the package plea agreement. This, however, is no more than a vague and factually unsupported characterization. As we have detailed above, plea negotiations spanned a considerable time period. *See* ¶¶ 6–7, *supra.* But even if we look only at the last two days, there is no reason to think Goyette had insufficient time. The prosecutor's final plea agreement was presented to Goyette on March 19, 2002, but Goyette did not enter his pleas until the next day. Goyette did not testify or otherwise present evidence suggesting that he thought

---

[13] At the end of his brief-in-chief, Goyette seemingly asks us to hold as a matter of law that, in package plea agreement situations involving serious charges, sixteen-year-olds are not able to voluntarily choose between exercising their right to trial and helping friends. Goyette states: "[U]nder no circumstances should a Circuit Court allow a 16 year-old defendant to be part of such an improperly coercive plea agreement when the defendant is charged with homicides." We agree with the State that this argument is so lacking in development that it does not merit our attention. *See State v. Pettit,* 171 Wis. 2d 627, 646–47, 492 N.W.2d 633 (Ct. App. 1992). For the same reason, we do not address Goyette's undeveloped requests for broad holdings that "package plea agreements are by their very nature improper" or, in the alternative, that package plea hearings be held individually for each defendant. That latter alternative, in particular, raises practical questions as to how defendants pleading later in time could be held to abide by the agreement.

he was locked into accepting the agreement before he entered his pleas at the plea hearing. There is no evidence that Goyette indicated to his attorney, in any fashion, that he wanted to meet and discuss the offer separately. Thus, as with his young-age argument, Goyette's insufficient-time argument provides no basis for the conclusion that his pleas were involuntary.

¶ 26. Goyette maintains that his counsel and Coryell's counsel "pressured" him into accepting the offer. Goyette does not, however, point to any evidence in the record—much less undisputed evidence—that either attorney engaged in improper coercive behavior. We have only Goyette's testimony recounting that the attorneys recommended acceptance of the agreement and that Goyette trusted them. As the State's appellate brief aptly states:  "If a lawyer's advice to a client that a plea offer represents a good deal amounts to coercion, then few guilty pleas could stand." *See United States v. Sanchez-Barreto*, 93 F.3d 17, 23 (1st Cir. 1996) (standing alone, a coercion allegation based on "defense counsel's enthusiasm for the negotiated plea bargain" is insufficient).

¶ 27. Goyette asserts that he did not have any opportunity to meet *alone* with his attorney after the final plea offer was made and before his plea hearing and, therefore, had no opportunity to tell his attorney he did not like the offer. But Goyette ignores his own testimony in which he said he met alone with his attorney before the plea hearing. We acknowledge this meeting was short—ten to fifteen minutes—but it would have taken little time for Goyette to tell his attorney that he did not really want to "go along."

¶ 28. Goyette's appellate briefs repeatedly state that he felt pressure because he believed his friends would be "mad" at him if he did not go along with the

agreement. Perhaps Goyette wants us to infer that he feared his codefendants would harm him if he did not go along with the agreement. If this is Goyette's argument, it suffers two defects. First, there is no factual finding that Goyette feared for his safety, and we will not assume fact finding in a manner that undercuts the circuit court's decision.[14] Second, Goyette did not testify that he was concerned about his safety. To the contrary, he expressly conceded that no one threatened him or suggested "something bad would happen" if he did not go along with the agreement. Goyette consistently and repeatedly testified that the "pressure" stemmed from his desire that his friends Coryell and Gregory get the benefit of the plea agreement. Thus, we decline to assume as a factual matter that Goyette feared his codefendants.

¶ 29. What remains is Goyette's argument that his pleas were involuntary because he felt pressure to go along with the package agreement so that his codefendants could obtain the benefit of that agreement. According to Goyette, he was "caught between loyalty to his friends and his own future." He contends he felt "pressure" owing to the circumstance of the package plea deal and this feeling overcame his self-interest, thereby rendering his pleas involuntary. The circuit court rejected this argument, explaining that, even if Goyette felt pressure in the sense that he "felt a psychological need to try to help [his] co-defendants to get this deal," pressure of this type does not render a plea involuntary. We agree with the circuit court and, like that court, our conclusion is driven by the supreme court's decisions in *Craker v. State*, 66 Wis. 2d 222, 223

[14] *See* footnote 11, *supra.*

N.W.2d 872 (1974); *Seybold v. State*, 61 Wis. 2d 227, 212 N.W.2d 146 (1973); and *Drake v. State*, 45 Wis. 2d 226, 172 N.W.2d 664 (1969).[15]

¶ 30. In *Craker*, the supreme court addressed whether a plea was involuntary in the sense of being improperly coerced because of religious scruples and pressure from family, friends, and clergy. *Craker*, 66 Wis. 2d at 225–28. The court's discussion rejecting that argument aptly summarizes pertinent parts of *Seybold* and *Drake*, and explains why we must reject Goyette's argument here:

> With regard to the allegedly coercive effects of moral scruples and family pressure, the combined effect of which was supposedly to compel him to plead guilty only because of his moral culpability and not because of his legal guilt, a comparable situation appears in [*Drake*]. In that case, the defendant alleged that his plea of guilty was coerced in that it was made to protect his wife from criminal prosecution. [In *Drake*, we] upheld the trial court's refusal to allow the plea to be withdrawn, stating at page 233:
>
> " . . . It is not unusual that participants in criminal enterprises elect not to name their coconspirators. In the organized underworld, such refusal to involve others underlies the gangland penalty of Omerta, or Death

---

[15] Goyette says the circuit court seemed to erroneously believe that "a defendant is only entitled to withdraw his plea in package plea situations if he can prove that a codefendant directly threatened him." We disagree with this characterization. It is true that the court's questioning of Goyette during the hearing, and the court's statements during and after that hearing, show its concern with whether Goyette was directly or indirectly threatened. But the circuit court never suggested that threats are a prerequisite to a conclusion that a plea is involuntary due to coercion relating to a package plea agreement.

to the Informer. To recognize this attitude is not to applaud or encourage it. However, such refusal to involve others, even those equally guilty, cannot be described as coercive in any sense of that word. If it is, it is a self-imposed 'coercive element,' which does not weaken the voluntary and knowledgeable aspect of an act based upon it."

In [*Seybold*], the defendant contended that his guilty plea was involuntary because it was given in exchange for a promise that his wife, a codefendant, would be granted probation. [In *Seybold*, we] stated:

" 'As a matter of fact a fair interpretation of Seybold's language would support the premise that most of the coercion involved in arriving at the decision to plead guilty was applied by his wife and another female who "both burst into tears" when Seybold was reluctant to accept the "deal." ' "

*Craker*, 66 Wis. 2d at 228. The *Craker* court further explained:

"As recognized in *Rahhal v. State* (1971), 52 Wis. 2d 144, 187 N.W.2d 800, many guilty pleas have some element of compulsion but this is not to say that they are necessarily involuntary. In *Rahhal*, . . ., it was said:

" '... The distinction between a motivation which induces and a force which compels the human mind to act must always be kept in focus. When the defendant is not given a fair or reasonable alternative to choose from, the choice is legally coerced . . . .'

"In [*Drake*], this court said the defendant's subjective desire to plead guilty in order to avoid the implication of his wife in his jail break was a self-imposed coercive element which did not destroy the voluntariness of his plea."

So too in this case. The defendant's religious beliefs regarding the merits of confessing one's wrongdoing and his desire to mollify his family or give in to their desires are "self-imposed coercive elements" and do not vitiate the voluntary nature of the defendant's guilty plea.

*Id.* at 229.

¶ 31.  Collectively, *Craker*, *Seybold*, and *Drake* reject the proposition that a plea is constitutionally involuntary if it is motivated by a desire to obtain a benefit for another. None of these cases involved a package plea agreement, but Goyette suggests no reason why their reasoning should not apply here. We agree with Goyette that package plea agreements carry with them the risk that one of the defendants will be *improperly* pressured into entering a plea. But the pressure Goyette describes is not improper pressure. It is the same type of self-imposed pressure at issue in *Craker*, *Seybold*, and *Drake*.

¶ 32.  Therefore, we agree with the State that, even if the package plea agreement's offer of reduced charges, carrying with it limited exposure to imprisonment, had no effect on Goyette's decision to plead guilty and that Goyette only entered his pleas to help his friends, such facts would not establish that Goyette's pleas were involuntary.

### *Conclusion*

¶ 33.  For the reasons above, we affirm the circuit court.

*By the Court.*—Judgment and order affirmed.