STATE of Wisconsin, Plaintiff-Respondent,

v.

Bradley L. KILGORE, Defendant-Appellant.

Court of Appeals

*No. 2015AP997–CR. Submitted on briefs March 14, 2016.
—Decided May 18, 2016.*

2016 WI App 47

(Also reported in 882 N.W.2d 493.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Melissa L. Barrette* and *Brett T. Kaehne* of *Kirk Obear and Associates*, Sheboygan.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *David H. Perlman*, assistant attorney general, and *Brad D. Schimel*, attorney general.

Before Neubauer, C.J., Reilly, P.J., and Gundrum, J.

¶ 1. NEUBAUER, C.J. Bradley L. Kilgore appeals from a judgment convicting him of second-degree sexual assault after a jury found him guilty. During the execution of a search warrant at a residence Kilgore shared with David Peters where the suspected sexual assault of K.A.B. took place, Kilgore made multiple statements. He contends that the circuit court should have suppressed these statements, which were not preceded by *Miranda*[1] warnings, because he was in custody. Kilgore also contends that probable cause to obtain a buccal swab of his cheek for DNA testing was lacking. We reject both these contentions and, thus, affirm.

## FACTUAL BACKGROUND

### *K.A.B.'s Report of Rape*

¶ 2. On April 12, 2013, City of Sheboygan police responded to Sheboygan Memorial Medical Center to interview K.A.B. who had reported that she had been sexually assaulted earlier that morning. K.A.B. re-

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

counted that after midnight, she and some friends had gone to a bar. K.A.B. consumed two drinks, which she did not leave unattended. She did not feel intoxicated. While at the bar, she saw Peters, someone she had met several years before, but had not seen in a long time. Peters introduced K.A.B. to his roommate, Kilgore. Peters asked K.A.B. for her phone number, and she gave it to him. K.A.B. left the bar and drove a friend home.

¶ 3. While K.A.B. was on her way home, Peters called her and asked her to come to his home where he lived with Kilgore. She agreed. There, Kilgore gave K.A.B. a drink containing orange juice; she did not see him make the drink. K.A.B. asked Peters for Tylenol for her back pain. He gave her two pills, and she took them without looking to see if they were Tylenol. Toxicology would later show that K.A.B. had benzodiazepines and zolpidem in her system, the latter which is a sleeping aid comparable to Ambien and could significantly sedate a person unfamiliar with it. The last thing K.A.B. remembered was taking a photo of herself and Peters sitting together on a blue chair in the living room.

¶ 4. At 1:00 p.m., K.A.B. woke up in Peters' bedroom wearing only an undershirt. She went to leave and started vomiting. Her vomit was orange and foamy. She felt dazed and confused. K.A.B. started driving home but was having double vision. She pulled over and called a friend who took her to the hospital.

¶ 5. At the hospital, a rape kit was taken. K.A.B. said she had pain in her genitals and numerous bruises were observed on her buttocks, inner thighs, neck, and chest. K.A.B. told the police that Peters showed her needles he used for heroin, and he mentioned that he had cocaine and heroin at his residence.

## The Execution of the Search Warrant

¶ 6. As a result of K.A.B.'s report, a City of Sheboygan police detective, Tamara Remington, applied for a warrant to search the Peters/Kilgore residence. Among the things the police sought to recover were a comforter, drugs, and DNA samples from Peters and Kilgore.

¶ 7. On April 16, 2013, at approximately 2:00 p.m., the police executed the search warrant. According to the suppression hearing testimony of Remington, she was assisted by a captain, a detective, an officer, and members of the SWAT team. The target of the warrant was Peters, Remington said, because K.A.B. knew him and woke up naked in his bed. The only information the police had that Kilgore might have raped K.A.B was a text message Peters sent her asking if Kilgore had raped her. Remington denied that Kilgore was a suspect, rather, the police were seeking his DNA only to rule him out, including when testing the evidence they recovered, such as bedding. In fact, when Remington first drafted the warrant application, she "hadn't even thought of [Kilgore] personally." Someone else had "brought [Kilgore] to [her] attention," that he should be included in the warrant in order "to rule him out." Remington explained that the police always obtained DNA from the residents who lived there in order to rule them out. DNA would clear Kilgore, Remington thought. She considered Kilgore as a "potential witness."

¶ 8. During the execution of the search warrant, the SWAT team, who was heavily armed, surrounded the house. There was a voice at the door, Kilgore, who let the SWAT team inside. The SWAT team placed Kilgore facedown in the kitchen and held him at

gunpoint. Meanwhile, the rest of the officers cleared the residence looking for any type of imminent danger. Once the residence was secured, the SWAT team vacated it.

¶ 9. Remington and the captain searched a seat in the living room and then directed Kilgore to that seat. Three or four other officers, meanwhile, searched the residence. Remington explained that while the detectives were heavily armed upon their entry into the residence, those weapons were secured by the time the residence had been cleared. The detectives had only handguns on their persons. No longer were any weapons drawn on Kilgore. Kilgore was not in handcuffs. However, Kilgore was not free to leave the residence. In other words, the police "would not let him just walk out," but, this was never conveyed to him. Kilgore was given a copy of the warrant and told that the police would be taking a buccal swab from the inside of his cheek. Kilgore said, "no problem," that he had never touched K.A.B., and that "his DNA would not be on her or in her."

¶ 10. Before the swab was taken, "[t]here was a great deal of conversation." In talking with Kilgore, Remington testified that she was "trying to find out about David Peters, our primary target, his location." Peters was well known by the police, he was a frequent criminal suspect, and considered "[v]ery dangerous." Remington testified that the police did not have the same concerns with Kilgore. In response, Kilgore was "very talkative," "very cooperative, helpful," and "cordial," even offering things "spontaneously."

¶ 11. For example, they discussed Kilgore's landlord, and how Kilgore was scared that he was going to be evicted because of Peters' "antics," meaning people "coming for drugs and things like that." They talked

207

"about things [Kilgore] liked, games he liked to play," and his daughter. Remington asked Kilgore about Peters' whereabouts, and Kilgore said that he had some disease and was probably at the doctor. In fact, Peters called the house a couple of times, and Remington spoke with him briefly.

¶ 12. Remington asked Kilgore about Peters' involvement, and Kilgore said that on the prior evening Peters had brought a "nice white girl home." Remington asked him who made drinks for the victim, and Kilgore said that she did. Kilgore was pointing out different alcohols in the kitchen, and Remington would go into the kitchen to look while the captain stayed in the living room with Kilgore. Kilgore talked about pills that Peters supplied and crushed and snorted with K.A.B., identifying where that took place. He said that he was unable to hear what went on when Peters and K.A.B. went into Peters' bedroom, because he had on headphones while playing a video or computer game.

¶ 13. Kilgore talked about how Peters ate "pills like candy" and used heroin because he took too many prescription pills. Kilgore said he had to keep the drugs in his room to keep Peters from overusing them. Kilgore offered to help find Peters' drugs, but he was told to stay seated, and that the police would find them. Kilgore also talked about Peters' "escapades." Kilgore said that "girls are attracted" to Peters and "act like [his] slaves."

¶ 14. During the discussion, Remington was standing several feet from Kilgore and not over him. The police never read *Miranda* warnings to Kilgore. No threats or promises of leniency were made to Kilgore.

*The Circuit Court Denies Kilgore's Motion to Suppress the Statements He Made During the Execution of the Search Warrant*

¶ 15. At the end of the suppression hearing, defense counsel argued that Kilgore was in custody at the time of the execution of the search warrant and since he was not afforded the benefit of *Miranda* warnings, the statements he made to the police should be suppressed.

¶ 16. The circuit court denied Kilgore's motion, reasoning as follows:

> I'm satisfied by the rationale in the [*State v.*] *Goetz*, [2001 WI App 294, 249 Wis. 2d 380, 638 N.W.2d 386] case that as a matter of law [a detention during the execution of a search warrant is] not an in-custody situation that would call for *Miranda* in and of itself. So you got to look at the particular situation and the facts in a particular situation.
>
> And here you got a search warrant that was executed about ten minutes to two in the afternoon. And that in and of itself is really fairly neutral . . . .
>
> When officers went in they did direct Mr. Kilgore to the ground, and they did hold a gun on him. And the SWAT unit did a sweep of the residence to secure it. And once it was secured things changed. And I agree with [the assistant district attorney] that things did change.
>
> And Mr. Kilgore was released from his handcuffs. He was allowed to sit down in a chair in the living room. The SWAT unit left. The detectives stayed, and they did not have any weapons that were unholstered. They did not threaten him in any way that I can see or as I recall from the testimony of Detective Remington.
>
> The questioning concerned primarily Mr. Peters. That's how I recall her testimony. It wasn't about Mr.

Kilgore, it was about Mr. Peters because Mr. Peters was the subject of the search warrant. And Mr. Kilgore's conduct was, in the words of Detective Remington, very cooperative. He was very cooperative. So it doesn't appear that he was intimidated by the situation.

So as I look at all the factors, I believe that he was not in custody. This was not a situation where a reasonable person would think that this was more than a temporary detention . . . .

The court also denied Kilgore's challenge based on a lack of probable cause to support the warrant. Kilgore appeals.

## ANALYSIS

### *The Law of Custodial Interrogation*

¶ 17. The Fifth Amendment to the United States Constitution and article I, section 8(1) of the Wisconsin Constitution protect a criminal defendant's right against self-incrimination.[2] In *Miranda v. Arizona*, 384 U.S. 486 (1966), the United States Supreme Court held that a defendant is entitled to certain warnings when being interrogated while "in custody." *See Stansbury v. California*, 511 U.S. 318, 322 (1994). This is because, when a suspect is in police custody, there is a heightened risk of obtaining statements that "are not

---

[2] Our supreme court's interpretation of article I, section 8(1) of the Wisconsin Constitution has generally been consistent with the United States Supreme Court's interpretation of the Fifth Amendment to the United States Constitution. *State v. Ward*, 2009 WI 60, ¶ 18 n.3, 318 Wis. 2d 301, 767 N.W.2d 236.

the product of the suspect's free choice." *J.D.B. v. North Carolina*, 564 U.S. 261, 268–69 (2011).[3]

■

¶ 18. In *Miranda*, the Court described "custody" as when a suspect has been "deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. "[T]he ultimate inquiry," the Court later said, was whether there was "a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995) (citation omitted). In order to make that determination, a court will look at the totality of the circumstances. *State v. Lonkoski*, 2013 WI 30, ¶ 28, 346 Wis. 2d 523, 828 N.W.2d 552.

■

¶ 19. Among the factors a court may consider are "the defendant's freedom to leave; the purpose, place, and length of the interrogation; and the degree of restraint." *Id.* (citation omitted). On the latter, a court will consider whether the defendant was handcuffed, whether a gun was drawn on the defendant, whether a *Terry*[4] frisk was performed, the manner in which the defendant was restrained, whether the defendant was moved to another location, and the number of police officers involved. *Lonkoski*, 346 Wis. 2d 523, ¶ 28. The test "is an objective one," that is, "whether a reasonable person in the suspect's position would have considered himself or herself to be in custody." Goetz, 249 Wis. 2d 380, ¶ 11.

---

[3] If someone is subjected to custodial interrogation without the warnings and makes statements, whether exculpatory or inculpatory, then those statements constitute a *Miranda* violation and, absent exceptions, cannot be used by the prosecution. *Miranda*, 384 U.S. at 444.

[4] *Terry v. Ohio*, 392 U.S. 1 (1968).

## Standard of Review

¶ 20. In reviewing the circuit court's determination of a motion to suppress, we accept the court's findings of historical fact unless clearly erroneous. *State v. Morgan*, 2002 WI App 124, ¶ 11, 254 Wis. 2d 602, 648 N.W.2d 23. The question of whether a defendant is in custody, however, is one of law, and, thus, we review that question de novo based on the facts as found by the circuit court. *Id.*

## Kilgore Was Not In Custody

¶ 21. The Fifth Amendment does not prohibit the police from asking questions during execution of a search warrant, even though the suspect is not free to leave during the temporary detention, nor does it prohibit the suspect from volunteering an incriminating statement. What the Fifth Amendment does prohibit is the use of practices or tactics that *compel* a person to incriminate himself or herself: tactics which create a coercive custodial environment that is the functional equivalent of a formal arrest in which "the behavior of . . . law enforcement officials is such as to overbear the [individual's] will to resist and bring about confessions not freely self-determined." *Beckwith v. United States*, 425 U.S. 341, 347–48 (1976) (citation omitted); *see Miranda*, 384 U.S. at 457–58. Here, the circuit court credited the testimony of Remington at the suppression hearing to find that, after the SWAT team left the premises and Kilgore was moved to the living room, the element of compulsion associated with a formal arrest during the ensuing conversation between Kilgore and the two officers was

lacking. The court, looking at the totality of the circumstances, found that after the SWAT team secured the residence and left, "things changed," to the point where "this was not a situation where a reasonable person would think this was more than a temporary situation." We agree.

¶ 22. Proceeding through each of these factors, the primary purpose of the questioning, as Remington testified, was to find Peters. He was the "primary target." This was because Peters knew K.A.B., had invited her to his home, and she woke up to find herself half naked in his bed. Peters was well known by the police, a frequent criminal suspect, and considered "very dangerous." The reason Kilgore's DNA was even sought, according to Remington, was to rule him out as a suspect. While the officer's subjective intent is irrelevant, the officer's testimony regarding her inquiries and focus on Peters, which was accepted by the circuit court, is relevant to the extent they influenced the objective conditions surrounding the conversations. *Lonkoski*, 346 Wis. 2d 523, ¶¶ 34–35.

¶ 23. Here, the testimony is undisputed that the police questions were primarily focused on Peters—his whereabouts, his behavior the night before, his use of drugs, his interactions with K.A.B, his escapades with other women, etc. There is no evidence that the tone of the police questioning of Kilgore was accusatory or hostile. *See United States v. Borostowski*, 775 F.3d 851, 862 (7th Cir. 2014) (stating that generally where the tone of the questioning is not hostile or combative this supports a finding of noncustody); United States v. Panak, 552 F.3d 462, 465–66 (6th Cir. 2009) (noting that *Miranda* was concerned with the potentially coercive police tactic of isolating suspects in unfamiliar environments, but that concern does not apply to most

213

in-home interrogations, even when "the individual has become the *focus* of an investigation" (emphasis added)).

¶ 24. Indeed, Kilgore himself did not behave as though the atmosphere was coercive or intimidating. He was described by Remington as "very talkative," "very cooperative, helpful," and "cordial," even offering things "spontaneously."[5] He seemed all too willing to implicate Peters as best he could. Kilgore even discussed his landlord, computer games, and his daughter. The circuit court, again, accepted Remington's testimony, and concluded that it did not "appear that [Kilgore] was intimidated by the situation." The objective facts do not indicate that the environment, as it had evolved, was so coercive in either character or tone that Kilgore was induced to speak "where he would not otherwise do so freely." *Miranda*, 384 U.S. at 467.

■

¶ 25. The place of the questioning was Kilgore's own home. This is significant because when "a person is questioned on his own turf . . . the surroundings are not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation." *United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004) (citations omitted); *see Miranda*, 384 U.S. at 449–50 (the suspect is "more keenly aware of his [or her] rights and more reluctant to tell of his [or her] indiscretions or criminal behavior within the walls of

---

[5] While Kilgore's willingness to help the police might be considered a reflection of his subjective state of mind and not that of a reasonable person, we think it still bears on the general atmosphere of the interview as created by the police. *See United States v. Hashime*, 734 F.3d 278, 285 (4th Cir. 2013).

his [or her] home"); *see also Beckwith*, 425 U.S. at 346 n.7 (the "principal psychological factor" of concern is "isolating the suspect in unfamiliar *surroundings* 'for no purpose other than to subjugate the individual to the will of his examiner' " (quoting *Miranda*, 384 U.S. at 457)).

¶ 26. The length of the discussion is unknown, but Remington described it as a "very long time." A "very long time" is a relative term, but, in cases involving questioning of a suspect for over two hours, where other noncoercive circumstances were present, there has been a finding of noncustody. *See Czichray*, 378 F.3d at 827 (recounting that in the only United States Supreme Court decision involving questioning at a private residence which involved a three-hour interrogation, the court found the suspect was not in custody) (citing *Beckwith*, 425 U.S. at 347); *State v. Mosher*, 221 Wis. 2d 203, 207, 584 N.W.2d 553 (Ct. App. 1998).

¶ 27. Regarding the degree of restraint, Kilgore was not in handcuffs.[6] While Kilgore was ordered facedown at gunpoint during the initial entry of the SWAT team, by the time he was questioned, the SWAT team had left the residence, and the detectives questioning him had their guns holstered. The questioning was done by two detectives. Kilgore was moved from the kitchen to the living room and directed to sit in a seat that had been searched, but, again, he was still in his home. *See United States v. Craighead*, 539 F.3d 1073, 1088 (9th Cir. 2008) (suggesting that an inter-

---

[6] The circuit court stated that Kilgore was in handcuffs while the SWAT team secured the residence, although they were taken off him when Remington began questioning him. While Remington did not mention handcuffs, she did testify that Kilgore was "secured." In any case, Kilgore was not in handcuffs while being questioned.

view conducted in a suspect's kitchen, living room, or bedroom might allow the suspect to take comfort in the familiar surroundings of the home and decrease the sensation of being isolated in a police-dominated atmosphere). Remington testified that she was not standing over him and, at times, she walked away from the living room to check on something Kilgore had mentioned that was in the kitchen.

¶ 28. In arguing that he was in custody, Kilgore makes much of the fact that Remington testified that he was not free to leave. This, however, was never communicated to Kilgore. In any event, Kilgore takes Remington's testimony and applies it too strictly. Her testimony that Kilgore was not free to leave must be considered in context. The context was that the police were there to execute a search warrant. The police had obtained judicial authorization to obtain DNA from Kilgore via a buccal swab of his cheek. In addition, the police had judicial authorization to search the premises. In other words, while Kilgore was not free to leave his home during execution of the search warrant, he would be when the officers were done, i.e., he was not under arrest, but rather, temporarily detained.

¶ 29. The United States Supreme Court has made clear that during the execution of a search warrant, the police have the authority to detain an occupant of the residence incidental to the search. *See Muehler v. Mena*, 544 U.S. 93, 98 (2005); *Michigan v. Summers*, 452 U.S. 692, 705 (1981). The occupant is detained or seized during the execution of the search warrant but that seizure is considered reasonable. *See Muehler*, 544 U.S. at 98–99. Thus, the police could

detain Kilgore for the duration of the search of the residence without running afoul of the Fourth Amendment. *See id.* at 98.[7]

██

¶ 30. Here, though, we deal not with the Fourth Amendment, but with the Fifth Amendment, and a seizure does not necessarily equate with custody. *See United States v. Revels*, 510 F.3d 1269, 1274 (10th Cir. 2007); *United States v. Burns*, 37 F.3d 276, 281 (7th Cir. 1994) ("in the usual case, a person detained during the execution of a search warrant is not 'in custody' for purposes of *Miranda*"); *Goetz*, 249 Wis. 2d 380, ¶ 17; *State v. Gruen*, 218 Wis. 2d 581, 593, 582 N.W.2d 728 (Ct. App. 1998). As the circuit court aptly noted, following well-established precedent, *Goetz* held that a detention during execution of a search warrant does not amount to custody in and of itself. *Goetz*, 249 Wis. 2d 380, ¶ 17. In concluding that the defendant was not in custody during an in-home execution of a search warrant under the circumstances of Goetz's detention, we relied on *Summers*, stating that a detention during the execution of a search warrant is "substantially less intrusive than an arrest." *Goetz*, 249 Wis. 2d 380, ¶ 12 (citation omitted). Being detained in one's own home "could add only minimally to the public stigma associated with the search itself and would involve neither the inconvenience nor the indignity associated with a compelled visit to the police station." *Id.* (quoting *Summers*, 452 U.S. at 702).

---

[7] The Fourth Amendment to the United States Constitution and article 1, section 11 of the Wisconsin Constitution contain substantively identical provisions that our supreme court has historically interpreted in accord with the United States Supreme Court's interpretation of the Fourth Amendment. *State v. Dumstrey*, 2016 WI 3, ¶ 14, 366 Wis. 2d 64, 873 N.W.2d 502.

¶ 31. Although different in some respects from a detention incident to the execution of a search warrant, for our purposes a *Terry* stop provides a useful analogy as it relates to the "free to leave" analysis. If a seizure was synonymous with custody, then *Miranda* warnings would be required during every *Terry* stop, because, in a sense, a person seized during a *Terry* stop, or detained incident to the execution of a search warrant, is not free to leave. *See Berkemer v. McCarty*, 468 U.S. 420, 435–37 (1984) (rejecting argument that in every traffic stop a person is in custody); *United States v. Acosta*, 363 F.3d 1141, 1148 (11th Cir. 2004) (stating that if the court applied the "free to leave" test "literally to *Terry* stops," then *Miranda* warnings would be "required before any questioning could occur during *any Terry* stop" (emphasis added)).

¶ 32. In other words, these sorts of seizures that do, in fact, impede a person from leaving could not be what the United States Supreme Court had in mind when it talked of the freedom to "terminate the interrogation and leave." *Thompson*, 516 U.S. at 112. The difference between a seizure and custody, both interferences with one's liberty, is a matter of degree. *See United States v. Bengivenga*, 845 F.2d 593, 598 (5th Cir. 1988). A person seized during a *Terry* stop or incident to execution of a search warrant is not free to leave, but that person will expect that after answering some questions or waiting for the police to complete their investigation or search, assuming nothing incriminating is found, he or she will be free to go.

¶ 33. A seizure, as compared to custody, is limited in duration and scope, and does not have the same element of coercion. The inability to leave must be

considered in that context. Thus, the inability to leave is "not the determinative consideration," *Gruen*, 218 Wis. 2d at 593, but, a "factor" of what is the "*ultimate*" question, whether there was a "restraint on freedom of movement of the degree associated with a formal arrest." *Thompson*, 516 U.S. at 112; *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (emphasis added); *United States v. Swanson*, 341 F.3d 524, 531 (6th Cir. 2003); *Goetz*, 249 Wis. 2d 380, ¶¶ 12–13, 17. In other words, the objective circumstances must be the functional equivalent of a formal arrest, along with the inherently coercive aspects of custodial questioning designed to overcome the suspect's free choice.

¶ 34. Considered in proper context, Kilgore's inability to leave while the police obtained a buccal swab of his cheek and completed their search of the residence did not transform that temporary detention into custody. The circumstances surrounding the encounter—in the afternoon, in Kilgore's living room, without handcuffs or guns drawn, the SWAT team gone, the absence of threats or promises of leniency, the focus of the questions on Peters, and the nonaccusatory nature of the questioning—would not have led a reasonable person to believe that he or she was being restrained to the degree associated with formal arrest. There are no facts indicating the officers would continue questioning until Kilgore provided the answers to questions they sought. Indeed, after the police completed their search, Kilgore was free to go about his business. *See Czichray*, 378 F.3d at 827 (noting that one factor a court may consider is whether the suspect was placed under arrest at the termination of questioning). The circuit court did not err in finding that, under the totality of the circumstances, Kilgore was not in custody.

*The Dissent Reweighs the Evidence and Reassesses the
Credibility of Remington*

¶ 35. The dissent notes that we "part ways on the
emphasis we each place on the facts found in the
record." We agree. The dissent draws its own conclu-
sions about the "facts" by discounting both Reming-
ton's suppression testimony and the circuit court's
findings of fact and ruling. For example, the dissent
argues that Remington's portrayal of her conversation
with Kilgore as a "friendly little chat was artful."
Dissent, ¶ 59. The dissent comes to this conclusion
after having discredited Remington because her testi-
mony that she considered Kilgore as a potential wit-
ness was inconsistent with her seeking a sample of his
DNA. But, the circuit court credited Remington's tes-
timony, finding that "the questioning primarily con-
cerned Mr. Peters," and that "Peters was the subject of
the search warrant." Remington's testimony regarding
the subjects discussed with Kilgore bears this out.
Additionally, the court, based on Remington's testi-
mony, found that Kilgore was "very cooperative" and
he did not appear to be intimidated. The dissent makes
no claim that these findings are clearly erroneous.[8] In
any event, regardless of Remington's focus or purpose,
there is no evidence the officers' questions were hostile,
aggressive, coercive or accusatory. Nor is there evi-
dence of deception. The dissent does not point to any
evidence to the contrary.

―――――――――――――――――――――――――――――――――――

[8] Contrary to the dissent's suggestion that we, the major-
ity, "believe" and "accept" Remington's suppression testimony,
we are bound to accept the circuit court's findings of fact unless
they are shown to be clearly erroneous.

¶ 36. The dissent also suggests that Remington delayed taking the buccal sample, but there is no evidence to support this conclusion, and, in any event, the officers were entitled to detain him until the search of his home was completed. Ultimately, and most importantly, the dissent ignores the circuit court's finding that, after the SWAT team left, "things changed." We are not free to reweigh the evidence or reassess a witness's credibility. *State v. Young*, 2009 WI App 22, ¶ 17, 316 Wis. 2d 114, 762 N.W.2d 736 (2008). Our duty is to "search the record for evidence that supports findings the circuit court made, not for findings it could have made but did not." *Id.* The circuit court properly denied Kilgore's motion to suppress his statements.

## Harmless Error

¶ 37. In light of our determination holding that there was no error, the State's argument that the error was harmless need not be addressed. *See State v. Harris*, 189 Wis. 2d 162, 182 n.14, 525 N.W.2d 334 (Ct. App. 1994), *aff'd on other grounds,* 199 Wis. 2d 227, 544 N.W.2d 545 (1996).[9]

## Probable Cause Existed to Take Kilgore's DNA

¶ 38. Kilgore argues that probable cause to take DNA from him was lacking. For one reason, he contends, Remington never told the warrant-issuing court

---

[9] The dissent in effect concurs in affirming the judgment of conviction on the grounds that the constitutional error was harmless, although no analysis is provided. Dissent, ¶ 62.

that she considered Kilgore as a potential witness and not a suspect. For this same reason, Kilgore appears to contend that this was a *Franks*[10] violation.

¶ 39. A search warrant "may issue only upon a finding of probable cause by a neutral and detached magistrate." *State v. Ward*, 2000 WI 3, ¶ 21, 231 Wis. 2d 723, 604 N.W.2d 517 (citation omitted). The probable cause test is one of common sense. *Id.*, ¶ 23. The task of the court is to decide "whether, given all the circumstances set forth in the affidavit before [the court], including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* (citation omitted). In reviewing that determination, we accord the warrant-issuing court great deference. *Id.*, ¶ 22. Our duty is to ensure that the court had a substantial basis for concluding that probable cause existed. *See State v. DeSmidt*, 155 Wis. 2d 119, 133, 454 N.W.2d 780 (1990).

■■

¶ 40. Here, the circuit court had a substantial basis for concluding that probable cause supported the police's application to obtain DNA from Kilgore. The affidavit supporting the warrant application recounted that K.A.B. had gone to the home of Kilgore and Peters. Kilgore had given K.A.B. a drink, and Peters

---

[10] A search warrant is void and the fruits recovered from that search must be suppressed where there is a false statement in the affidavit supporting the search warrant, the statement was made knowingly and intentionally or with reckless disregard for the truth, and absent the challenged statement, the warrant is not supported by probable cause. *See Franks v. Delaware*, 438 U.S. 154, 156 (1978). *Franks* also applies to a "critical omission." *See State v. Mann*, 123 Wis. 2d 375, 385–86, 367 N.W.2d 209 (1985).

had given her two pills, none of which she knew the contents. K.A.B. took a photo with Peters, and then she had no memory of anything else that happened over the next eleven hours until she awoke half naked in Peters' bed. She discovered bruises on her body and had pain in her genital area. The obvious inference was that one or both of the two men had drugged K.A.B., and then one or both of them sexually assaulted her.[11] *See* id. at 135. That some evidence indicated that Peters was the more likely perpetrator —that he and K.A.B. knew each other, he had invited her to his home, and she awoke in his bed—does not rule out probable cause as to Kilgore, who was also present at the time. The question is one of probabilities. "What is required is more than a possibility, but not a probability, that the conclusion is more likely than not." *State v. Tompkins*, 144 Wis. 2d 116, 125, 423 N.W.2d 823 (1988). In *Tompkins*, our supreme court illustrated this point with the following example:

> [W]here there is evidence that would lead a reasonable person to conclude that the evidence sought is likely to be in a particular location—although there may be other evidence that could lead a reasonable person to conclude that the evidence may instead be in another location—there is probable cause for a search of the first location. The search of the first location is appropriate although there may also be probable cause to believe the evidence may be in the second or third location.

*Id.* That example applies here with equal force. K.A.B. was in the company of two men, both of whom had given her something that could have led to her impairment, and she awoke in their home to find that she had

---

[11] Peters' DNA was found on bruises to K.A.B.'s neck.

been sexually assaulted. It may have been Peters or it may have been Kilgore or it may have been both men. Certainly with both means and opportunity to commit the offense, there was more than a possibility that Kilgore had more likely than not drugged and/or raped K.A.B.

¶ 41. As for Remington's failure to tell the warrant-issuing court that she viewed Kilgore as a potential witness and not a suspect, her subjective viewpoint is irrelevant. Whether probable cause exists to issue a warrant is an objective, not a subjective, test. *See State v. Kiper*, 193 Wis. 2d 69, 81, 532 N.W.2d 698 (1995); 3 WAYNE R. LaFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 3.2(b) (5th ed. 2012). Thus, we need not consider her viewpoint, and her failure to tell it to the warrant-issuing court was not a "critical omission" from the affidavit supporting the search warrant so as to constitute a *Franks* violation. *See State v. Mann*, 123 Wis. 2d 375, 385–86, 367 N.W.2d 209 (1985).

### CONCLUSION

¶ 42. The totality of the circumstances demonstrate that Kilgore was not in custody when he spoke with police while they were executing a search warrant. Although he was not free to leave while the police completed their search of his residence and obtained his DNA, that detention was limited and did not rise to the level of restraint on his freedom of action associated with formal arrest. As such, Kilgore was not entitled to *Miranda* warnings, and his statements were properly admitted into evidence. Further, the circuit court had a substantial basis for concluding there was probable cause to support the application to

obtain Kilgore's DNA. Remington's subjective belief that Kilgore was only a potential witness was irrelevant for purposes of the probable cause analysis and, thus, also not a critical omission from the affidavit supporting the search warrant.

*By the Court.*—Judgment affirmed.

¶ 43. REILLY, P.J. (*concurring in part; dissenting in part*). I join with the majority that the search warrant was proper as probable cause existed that Bradley Kilgore had drugged and raped K.A.B. I respectfully dissent from the majority's conclusion that Kilgore was not "in custody" during his interrogation. "Custody" is a "term of art" in the world of *Miranda*.[1] *Howes v. Fields*, 132 S. Ct. 1181, 1189 (2012). "Art" and what it conveys is in the eye of the beholder. The majority looks at the facts from the record and sees the picture of a reasonable person (Kilgore) who would have felt at liberty to terminate the "very long" interrogation at any time and leave his home. Majority, ¶ 34. I look at the objective facts from the record and see the scene of a "police dominated atmosphere" in which a reasonable person would not have felt at liberty to terminate the interrogation and leave. *See Miranda v. Arizona*, 384 U.S. 436, 456 (1966); *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984); *Orozco v. Texas*, 394 U.S. 324, 325–26 (1969).

¶ 44. The majority and I part ways on the emphasis we each place on the facts found in the record. I place emphasis on the objective facts Detective Tamara Remington swore to in her affidavit for the search warrant and the SWAT-led raid at Kilgore's home, whereas the majority emphasizes the testimony from the suppression hearing. Majority, ¶¶ 21–22, 24,

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

34. I place emphasis on the fact that Kilgore was thrown to the floor with M4 rifles pointed at his head and shackles[2] placed on his arms, that at least five armed officers remained in the house after the SWAT team vacated, on Remington's admission that Kilgore was not free to leave during her interrogation, that Remington was not going to take the buccal swab of Kilgore until she finished her interrogation as she knew that as soon as the buccal swab was taken that Kilgore would be free to leave, and that when Kilgore tried to leave the living room he was ordered to stay where he was. The majority believes Remington's suppression hearing testimony that she was having a friendly chat with a "potential witness," rather than interrogating a suspected rapist implicated in drugging and raping K.A.B. Majority, ¶¶ 7, 10–14, 24. The "art" I see from the objective facts is the picture of a police-dominated atmosphere.

¶ 45. In order to determine how a suspect would have gauged his freedom of movement, courts must examine "all of the circumstances surrounding the

---

[2] As the majority admits, the circuit court stated that Kilgore was in handcuffs while the SWAT team secured the residence, but he was released from them when he was allowed to sit in the living room chair. The State also stated on the record that "there was a gun pointed at [Kilgore] and he was ordered to the ground in handcuffs and the SWAT team came through the residence to secure it" and noted a "momentary handcuffing" of Kilgore. No one contested these statements. Also, Remington was never specifically questioned as to whether Kilgore was *ever* in handcuffs; she merely testified that he was "secured" by the SWAT team and that he was not in handcuffs during questioning. Based on the evidence, I believe it is reasonable to conclude that Kilgore was handcuffed during the time the SWAT team was clearing the residence, but I concur with the majority that Kilgore was not in handcuffs during questioning. Majority ¶ 27 & n.6.

interrogation." *Howes*, 132 S. Ct. at 1189 (citation omitted). Relevant factors include, the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning. *Id.* The majority draws similarity between this case and *State v. Goetz*, 2001 WI App 294, 249 Wis. 2d 380, 638 N.W.2d 386, which the circuit court also relied on heavily. In *Goetz*, sheriff's deputies arrived at Goetz's home to execute a search warrant. *Id.*, ¶ 2. The deputies informed Goetz that they were there to execute a search warrant, that she was not under arrest, and that she would not be under arrest unless she obstructed the search. *Id.*, ¶ 3. She was instructed to sit at the kitchen table and was not handcuffed or otherwise restrained by the deputies. *Id.*, ¶ 4. The deputies questioned Goetz without reading her *Miranda* rights and Goetz made incriminating statements to the police. *Id.*, ¶¶ 4–5. After making the statements, Goetz was placed in handcuffs, which were later removed when her children came home from school. *Id.*, ¶ 5.

¶ 46. We concluded, citing *Michigan v. Summers*, 452 U.S. 692, 698 (1981), that "detentions during the execution of a search warrant implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Goetz*, 2001 WI App 294, ¶ 12. We determined that the facts indicated that a reasonable person in Goetz's situation would not have "considered her freedom of movement to be restrained to the degree associated with a formal arrest." *Id.*, ¶ 13. The only question was what effect the handcuffing had on this court's analysis, and we determined that it had no effect as the handcuffing was

after the interrogation rather than before or during the questioning. *Id.*, ¶¶ 14–15. The court concluded that a detention incident to execution of a search warrant under these circumstances did not amount to custody. *Id.*, ¶ 17.

¶ 47. The majority also cites to *United States v. Czichray*, 378 F.3d 822 (8th Cir. 2004), for the proposition that an in home interrogation is inherently less coercive. Majority, ¶ 25. In that case, two FBI agents arrived at Czichray's home and told Czichray that they needed to speak with him. *Id.* at 825. The interview lasted seven hours. *Id.* During the interview, Czichray was informed several times that he was "free to ask the agents to leave his home." *Id.* at 825. The Eighth Circuit Court of Appeals concluded that "[w]here a suspect is questioned in the familiar surroundings of his home, and informed several times of his right to terminate the interview at will, we believe that strong evidence of restraint on freedom of movement of the degree associated with a formal arrest is necessary to overcome the natural inference that such questioning is non-custodial." *Id.* at 830.

¶ 48. Based on the above cases, the majority reasoned that the police had the right to temporarily detain Kilgore during the search without the need for *Miranda* warnings and, further, that the element of compulsion associated with a formal arrest was absent when Kilgore was interrogated in his home. Majority, ¶ 34.

¶ 49. My review of the common law paints a different picture. I agree that an interrogation conducted by police in a suspect's home is not per se custodial. *See Beckwith v. United States*, 425 U.S. 341, 342–43 (1976); Majority, ¶ 25. Nevertheless, an interrogation in a suspect's home may be custodial under

certain circumstances. *See Orozco*, 394 U.S. at 325–26 (holding that an interrogation was custodial where four police officers arrived at the suspect's home, entered the bedroom, and behaved as though the suspect was not free to leave while he was questioned).

¶ 50. The determination of whether an in home interrogation is custodial requires an examination of the totality of the circumstances and "is necessarily fact intensive." *United States v. Craighead*, 539 F.3d 1073, 1084 (9th Cir. 2008). Applying the "free to leave" standard to an interrogation conducted within an individual's home presents a unique challenge as if a reasonable person, subject to interrogation in his home, "is told he is 'free to leave,' where will he go? The library? The police station? He is already in the most constitutionally protected place on earth." *Id.* at 1083. In *Craighead*, referenced by the majority at paragraph twenty-seven,[3] the court applied factors tailored to examining an in home interrogation under *Miranda*:

> (1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made.

*Craighead*, 539 F.3d at 1084.

¶ 51. Other circuits have also identified various lists of relevant factors for determining when an in home interrogation is custodial. *See, e.g., United States*

---

[3] The majority cited *Craighead* for the proposition that when an interview is conducted in a bedroom, kitchen, or living room, the suspect may take comfort in familiar surroundings, which may "decrease the sensation of being isolated in a police-dominated atmosphere." Majority, ¶ 27.

*v. Revels*, 510 F.3d 1269, 1275 (10th Cir. 2007) (questioning whether the atmosphere was police dominated, whether the nature and length of the officers' questioning was accusatory or coercive, and whether the suspect was informed that statements were voluntary and she was free to leave); *United States v. Mittel-Carey*, 493 F.3d 36, 39 (1st Cir. 2007) (citing "whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation"); *Sprosty v. Buchler*, 79 F.3d 635, 641 (7th Cir. 1996) (asking whether "and to what extent" the suspect was informed that questioning was voluntary, whether police used subterfuge, whether and to what degree the interrogation was "police dominated," whether the suspect was restrained, and whether the suspect could reasonably believe he could terminate the interrogation and leave); *United States v. Griffin*, 922 F.2d 1343, 1348–49 (8th Cir. 1990) (analyzing purpose, place, and length of interrogation; whether the suspect was informed that he was free to leave; whether the suspect was restrained; whether the suspect initiated contact; whether strong arm tactics were employed; whether the atmosphere was police-dominated; whether the suspect was arrested at the termination of questioning). The focus in all of these cases was whether and to what extent the police dominated the suspect's home.

¶ 52. In *Craighead*, eight law enforcement officers, representing three different government agencies, executed a search warrant on Craighead's residence. *Craighead*, 539 F.3d at 1078. All of the law enforcement officers were armed, and all of the FBI agents were wearing "raid vests." *Id.* One of the FBI

agents spoke to Craighead and informed him that he was not under arrest, any statement that he made would be voluntary, and that he was free to leave. *Id.* Craighead was not handcuffed at any point. *Id.* He was interviewed in a storage room at the back of the house, where he was joined by an FBI agent and a detective who stood in front of the door. *Id.* During the interview, which lasted approximately twenty to thirty minutes, Craighead made incriminating statements. *Id.* at 1078–79.

¶ 53. When considering Craighead's motion to suppress his statements, the court determined that Craighead was in custody for the purposes of *Miranda*. *Id.* at 1089. According to the court, the presence of a large number of armed officers and the fact that he was escorted to a back room for questioning with one officer guarding the door would lead a reasonable person to believe that there "was simply nowhere for him to go." *Id.* at 1089. The court did note that the fact that the FBI agent told Craighead that he was free to leave and that he was not under arrest weighed in favor of finding he was not in custody, but the police dominated atmosphere was too strong to overcome that factor. *See id.*

¶ 54. Similarly, in *Revels*, seven police officers forcibly entered Revels' home early in the morning to execute a search warrant. *Revels*, 510 F.3d at 1270. Once inside, the police immediately handcuffed Revels and her boyfriend and placed them face down on the floor in the hall. *Id.* Revels' handcuffs were later removed and she was allowed to get dressed and feed her young children. *Id.* at 1271. After police searched the home, Revels was taken to a back bedroom where an officer explained that the police were executing a search warrant, showed her some of the evidence—

drugs—they obtained during the search, and asked if she would be willing to cooperate. *Id.* Revels responded with incriminating statements. *Id.* at 1271–72.

¶ 55. The court determined that under the totality of the circumstances Revels was in custody at the time she made the statements. *Id.* at 1275. The court concluded that "a reasonable person in Revels' position would have perceived a police-dominated atmosphere." *Id.* According to the court, the "police were unequivocally in control of the circumstances both before and during Revels' questioning." *Id.* The court also refused to give significance to the fact that Revels was not handcuffed during questioning. *Id.* at 1276. The court found that police never indicated to Revels that she was free to leave or to terminate questioning, and, while the officers never told her she was under arrest, they also did not indicate that she was not. *Id.* According to the court,

> [t]his is particularly significant given that police had just engaged in an intrusive search warrant operation in Revels' home and had earlier placed Revels in handcuffs. In the face of the officers' dominance of the scene throughout the 30 minutes before her interview, Revels would have reasonably assumed that she was not free to leave her home or otherwise decline an interview with the officers.

*Id.* at 1276–77.

¶ 56. In this case, Remington was the detective in charge of the investigation and she swore out the affidavit to obtain the bodily fluid search of Kilgore and property search of Kilgore's home. As is pertinent to this appeal, Remington swore to the following in order to obtain the search warrant:

232

1. K.A.B. said she went to 1117 S. 16th Street in Sheboygan in the early morning hours of April 12, 2013. The residence located at 1117 S. 16th Street is the home of Kilgore.

2. That shortly after arriving at Kilgore's residence, Kilgore made K.A.B. a drink containing orange juice and shortly thereafter K.A.B. did not remember anything until she woke up at 1 p.m. with all of her clothes removed, except for an undershirt.

3. Shortly after waking up, K.A.B. began "vomiting orange, foamy colored vomit and felt 'dazed' and confused."

4. K.A.B. thought she was "drugged by 'David' and/or 'Brad.' "

5. Remington requested a buccal swab from both David Peters and Kilgore "for the purpose of matching DNA seized at a crime scene to a person's DNA profile . . . . [Remington] believe[d] that the DNA obtained from Peters and Kilgore could be compared to any DNA obtained from the rape examination that was conducted on [K.A.B.]"

6. Remington "also believe[d] that the search of the residence may produce evidence of the victim's vomit. This would further be evidence that of a crime being committed . . . . Further, examination of the vomit may identify a drug, or drugs, that were given to [K.A.B.]"

¶ 57. The magistrate signed the search warrant on April 16, 2013, at 11:00 a.m., authorizing Remington to take a buccal swab from Kilgore as it "may constitute evidence of the crime[] of" sexual assault. The search warrant was executed later that day by Remington and eleven other uniformed members of

233

law enforcement, including a SWAT team. The SWAT team, fully equipped with bulletproof vests, helmets, and rifles, surrounded Kilgore's home and knocked on his door. Kilgore allowed them to enter, and they did so aggressively, resulting in Kilgore immediately being held "facedown at gunpoint in the kitchen" where he was handcuffed by the SWAT team while the residence was cleared. Although the SWAT team exited the residence after it was secured, at least five other armed officers remained to execute the search warrant.

¶ 58. After the home was cleared, Kilgore was "lifted" off the kitchen floor, moved to the living room, directed where to sit, and was not allowed to get up from his seat or move to another room while Remington questioned him about the sexual assault of K.A.B. Despite questioning Kilgore directly regarding the sexual assault, Remington did not inform Kilgore that his cooperation was voluntary and did not tell Kilgore that he was free to leave. Remington never told Kilgore that he was under arrest, but she also did not indicate that he was not under arrest. Remington purposely did not take Kilgore's buccal swab until she finished her interrogation of Kilgore—an interrogation that she testified occurred "for a very long time"—as Remington knew that Kilgore would have the right to leave after the buccal swab was taken. Most importantly, Remington admitted that Kilgore was not free to leave and she would not have let him leave during her interrogation.

¶ 59. At the suppression hearing, Remington changed her tune from Kilgore being a suspect, as she averred in the search warrant, to Kilgore being a "potential witness." In the affidavit, Remington claimed that there was probable cause that Kilgore was involved in the drugging and raping of K.A.B., while at the suppression hearing she described Kilgore

as "somebody that we had to rule out" and "[a] potential witness." Remington testified at the suppression hearing that she did not think of Kilgore as a suspect because she "thought that DNA would clear him." Remington's portrayal of their conversation as a friendly little chat was artful. This chat, which lasted "a very long time," involved asking Kilgore who made the orange drink that was given to K.A.B. Remington was also aware at the time she interrogated Kilgore that Peters implicated Kilgore in the rape.

¶ 60. The majority accepts the post-event, retrospective interpretation offered by Remington that paints the picture of a detective having a friendly chat with a "potential witness" in his living room. I see a different picture. This case does not slightly resemble the facts posed in *Goetz, Summers,* or *Czichray.* The totality of the circumstances demonstrate that the police aggressively engaged in executing a search warrant in Kilgore's home and dominated the scene for the entire period of time that Kilgore was questioned. Based on the courts' holdings in *Craighead* and *Revels,* I look at the objective facts from the perspective set forth in Remington's affidavit for a search warrant and the SWAT-led raid of Kilgore's home, and I see the picture of a police dominated atmosphere, in which a reasonable person would not have felt at liberty to terminate the interrogation and leave.

¶ 61. The majority suggests that I am drawing my own conclusions about the facts by discounting Remington's testimony and the circuit court's findings of fact. Majority, ¶ 35. I agree that I discount the post-event recharacterization of the facts as testified to by Remington. I freely admit that I rely only on the objective facts from Remington's affidavit for the search warrant and the objective facts that described

the raid on Kilgore's home. In my opinion, it is illogical for the majority to agree that probable cause existed that Kilgore had drugged and raped K.A.B., majority, ¶ 40, while at the same time accepting Remington's revisionist testimony that Kilgore was never a suspect, only a "potential witness."

¶ 62. The government complied with the Fourth Amendment when it obtained a search warrant to take spit from Kilgore's mouth. The government failed to comply with the Fifth Amendment when it took words from Kilgore's mouth without *Miranda* warnings. As the constitutional error was harmless under the facts presented, I dissent solely from the majority opinion that Kilgore was not in custody.