STATE of Wisconsin,
Plaintiff-Respondent,

v.

Jeffrey L. TORKELSON,
Defendant-Appellant.†

Court of Appeals

*No. 2007AP636–CR. Submitted on briefs October 16, 2007.
—Decided November 14, 2007.*

2007 WI App 272

(Also reported in 743 N.W.2d 511.)

† Petition to review denied 6/10/08.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Tim Provis*, Port Washington.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *J.B. Van Hollen*, attorney general, and *David J. Becker*, assistant attorney general.

Before Hoover, P.J., Peterson and Brunner, JJ.

¶ 1. PETERSON, J. Jeffrey Torkelson appeals a judgment of conviction for repeated sexual assault of a child and an order denying his motion for postconviction relief. Torkelson argues a statement he made prior to receiving his *Miranda*[1] warnings should have been suppressed, and a charging error by the State entitles him to a new trial. We disagree and affirm.

### Background

¶ 2. In January 2004, the State filed a complaint charging Torkelson with three crimes: repeated sexual assault of a child by a caregiver, exposing genitals or pubic area, and child enticement. *See* WIS. STAT. §§ 948.02(1), 948.10(1), 948.07(1).[2] The complaint alleged Torkelson had showered with and performed oral sex on his six-year-old daughter on three or more occasions during November and December 2003. In March 2004, the State filed an Information containing the same charges.

---

[1] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

[2] All references to the Wisconsin Statutes are to the 2005–06 version unless otherwise noted.

¶ 3. Torkelson moved to suppress a statement he made to Nathan Walrath, a Lincoln County sheriff's deputy. At the suppression hearing, Walrath testified he had been on duty beginning at 10 p.m. on December 29, 2003. At the beginning of his shift, he was told Torkelson was expected at the sheriff's department to discuss an alleged sexual assault. Torkelson, accompanied by his wife Carrie,[3] arrived at the sheriff's department while Walrath was on patrol. Walrath returned to the sheriff's department and found Torkelson and Carrie seated in the lobby.

¶ 4. Walrath testified he passed through the lobby to collect the office supplies he needed to take statements. When he returned, Carrie was alone in the lobby. Carrie said Torkelson was in the bathroom taking "all of" his medication. Walrath knocked on the bathroom door and heard the sounds of water running and vomiting coming from inside. Walrath and another deputy opened the door with a key and found Torkelson drinking water from the sink. Walrath testified he asked Torkelson to back away from the sink, and observed an empty pill bottle fall to the ground when Torkelson did so. Walrath then asked Torkelson to remove his jacket, step out of the bathroom, and sit down in the lobby. Torkelson complied.

¶ 5. The deputies examined the pill bottle and determined that Torkelson could possibly have taken a large dose of a prescription narcotic. The deputies summoned an ambulance. Before the ambulance arrived, Walrath sat down in the lobby next to Torkelson

---

[3] Torkelson's wife's name is variously spelled "Carey," "Cary," and "Carrie" in the record. "Carrie" is the spelling used in the transcript of the suppression hearing. For clarity, we refer to Jeffrey Torkelson as "Torkelson" and Carrie Torkelson as "Carrie" throughout this opinion.

and said he wanted to talk about the reason Torkelson had come to the sheriff's department. Torkelson said it was difficult to talk about. Walrath asked Carrie to step outside, which she did. After some additional questions, Torkelson admitted performing oral sex on his daughter. Walrath testified that while Torkelson was at the sheriff's office, Torkelson was not told he had to wait for the ambulance, was not told he was under arrest, was not handcuffed, and was not physically restrained in any way. Walrath said the lobby where the conversation took place was unlocked and open to the public.

¶ 6. When the ambulance arrived, Torkelson was taken to a local hospital. It does not appear from the record that any officer accompanied Torkelson to the hospital. The deputies did, however, ask the hospital to call them when it was ready to release Torkelson so he could be placed in protective custody. The hospital did so, but Torkelson left the hospital before police arrived to place him in custody. He was taken into custody under WIS. STAT. ch. 51 while walking away from the hospital.

¶ 7. The circuit court concluded Torkelson was not in custody while in the station lobby, and denied the motion to suppress:

> What is clear is that he was not in custody at the time, and that there was no effort to handcuff him. He was not placed under arrest. He was not told . . . he had to wait for the E.M.T.'s, not told that he had to go with the E.M.T.'s. . . . It would appear that he was free to walk out the door if he wished, at least ostensibly from the testimony. The Court does not find that to be a custodial situation.

¶ 8. The case was tried to a jury, and the State's evidence included Walrath's account of Torkelson's confession. The jury found Torkelson guilty on all counts.

¶ 9. Torkelson filed a postconviction motion alleging the State was statutorily barred from pursuing counts two and three—exposing genitals and child enticement—in the same action as the sexual assault count. *See* WIS. STAT. § 948.025(3). He argued he was therefore entitled to dismissal of either the sexual assault count or the two other counts. He argued if the sexual assault count stood, he was entitled to a new trial or resentencing on that count.

¶ 10. The State conceded counts two and three were statutorily barred, but argued the remedy was simply to dismiss those counts and the concurrent sentences imposed on them. The circuit court agreed with the State, dismissed the second two counts, and denied the remainder of Torkelson's motion.

DISCUSSION

### I. Torkelson's admission to Walrath

¶ 11. Torkelson first argues his statement to Walrath should have been suppressed under *Miranda v. Arizona*, 384 U.S. 436 (1966). Under *Miranda*, police may not interrogate a suspect in custody without first advising the suspect of his or her constitutional rights. *Id.* at 444. Statements obtained in violation of *Miranda* must be suppressed. *Id.* When reviewing a circuit court's decision on a motion to suppress, we will uphold the circuit court's findings of fact unless clearly erroneous. *State v. Mosher*, 221 Wis. 2d 203, 211, 584 N.W.2d 553 (Ct. App. 1998). Whether those facts show a violation of *Miranda* is a question of law reviewed without deference. *Mosher*, 221 Wis. 2d at 211.

¶ 12. Here, the State concedes Torkelson's statement was made prior to any *Miranda* warnings and as

a result of questioning by Walrath. The only remaining question, then, is whether Torkelson was in custody at the time. We conclude he was not.

■■■

¶ 13. Custody is determined from the perspective of a reasonable person in the suspect's position. *State v. Pounds*, 176 Wis. 2d 315, 321, 500 N.W.2d 373 (Ct. App. 1993). A suspect is in custody when the suspect's freedom to act is restricted to a "degree associated with formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) (citation omitted).

¶ 14. *Berkemer* involved a motorist who made incriminating statements during a routine traffic stop. *Id.* at 423. The motorist argued his statements should have been suppressed because he was not given *Miranda* warnings when he was stopped. The Court disagreed. It first noted that *Miranda* warnings were a safeguard intended (1) to "ensure that the police do not coerce or trick captive suspects into confessing," and (2) to "relieve the inherently compelling pressures generated by the custodial setting itself . . . ." *Berkemer*, 468 U.S. at 433 (citation omitted).

¶ 15. The Court concluded neither of these concerns were present in a routine traffic stop. Unlike a stationhouse interrogation, a traffic stop is "presumptively temporary and brief." *Id.* at 437. The questioning associated with a traffic stop is also "quite different from stationhouse interrogation, which frequently is prolonged, and in which the detainee often is aware that questioning will continue until he provides his interrogators the answers they seek." *Berkemer*, 468 U.S. at 438.

¶ 16. In addition, the "circumstances associated with the typical traffic stop are not such that the motorist feels completely at the mercy of the police." *Id.*

A motorist is typically stopped in a public place and accosted by only one or two officers. This "both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the motorist's fear that, if he does not cooperate, he will be subjected to abuse." *Id.* The Court concluded traffic stops are therefore comparatively "non-threatening" and "noncoercive," and do not render a motorist "in custody" for *Miranda* purposes. *Berkemer*, 468 U.S. at 440.

¶ 17. Courts following *Berkemer* have developed a list of factors to consider when determining whether a suspect's freedom to act is restricted to a degree associated with formal arrest. *See State v. Morgan*, 2002 WI App 124, ¶ 12, 254 Wis. 2d 602, 648 N.W.2d 23. These factors include the suspect's freedom to leave, the purpose, place, and length of the interrogation, and the degree of restraint. *Id.* The degree of restraint includes "whether the suspect is handcuffed, whether a weapon is drawn, whether a frisk is performed, the manner in which the suspect is restrained, whether the suspect is moved to another location, whether questioning took place in a police vehicle, and the number of officers involved." *Id.*

¶ 18. This test is not, however, a matter of simply determining how many factors add up on each side. Rather, these factors are reference points that help to determine whether *Miranda* safeguards are necessary. In other words, we use the factors relevant in a given case to determine whether the circumstances present a risk that police may "coerce or trick captive suspects into confessing," or show that a suspect is subject to "compelling pressures generated by the custodial setting itself." *Berkemer*, 468 U.S. at 433 (citation omitted).

¶ 19. In this case, none of the concerns *Miranda* warnings are intended to address are present. First, Walrath testified the ambulance had to cover only a "short distance" to get to the sheriff's department. He "only had a short period of time to speak" with Torkelson "because the ambulance was coming and his safety was going to take precedence over my investigation." The questioning here, like that in a traffic stop, was therefore "presumptively temporary and brief." *See Berkemer*, 468 U.S. at 437. In addition, because of the time constraints, Walrath had little time to do more than ask Torkelson why he came to the police station and whether he came because of his daughter. Under those circumstances, Walrath simply was not in a position to "coerce or trick [Torkelson] into confessing," even if he had wanted to. *See id.* at 433.

¶ 20. In the same way, Torkelson was not placed in a coercive or police dominated atmosphere. He was questioned by only one officer in an area open to the public.[4] No officer gave him any orders, made any show of force, or even told him he was required to wait for the ambulance. He was not handcuffed, was not physically restrained, and was not placed in an interview room or office. While Walrath did control the situation to some degree by asking Torkelson to sit down in the lobby and asking Carrie to step outside, his actions were similar to the control an officer would typically exercise over a motorist in a routine traffic stop. In short, like the motorist in *Berkemer*, Torkelson was not subject to "compelling pressures generated by the custodial setting itself." *See id.* Based on all the facts and circum-

---

[4] A second officer was present when Torkelson was asked to leave the bathroom, but the record does not indicate the second officer asked any questions or was present during the questioning.

stances here, a reasonable person in Torkelson's position would not believe his freedom was restricted to a "degree associated with formal arrest." *See id.* at 440.

¶ 21. Torkelson lists several factors he contends show he was in fact in custody. He first argues his decision to come to the police station in the first place was not voluntary because he came in response to an "ultimatum" from his wife Carrie. However, the fact that a decision was made while facing personal pressure, such as pressure from a family member, does not mean the decision was involuntary. *Craker v. State,* 66 Wis. 2d 222, 229, 223 N.W.2d 872 (1974). Nothing in Carrie's demand would lead a reasonable person in Torkelson's position to believe he was in the custody of the State while at the police station.[5]

¶ 22. Torkelson next argues the interrogation took place in a "police dominated atmosphere," especially after Walrath asked Carrie to step outside. However, as discussed above, the level of police control over the situation was no greater than that associated with a routine traffic stop. And while Walrath did ask Carrie to step outside, this was not done to "deprive [Torkelson] of any outside support." *See Miranda,* 384 U.S. at 455. Instead, Walrath asked Carrie to leave because she was upset and was interfering by attempting to get Torkel-

---

[5] Torkelson relies on *Yarborough v. Alvarado,* 541 U.S. 652 (2004). However, *Yarborough* involved a minor brought to the police station by his parents. *Id.* at 656. This made "the extent of [the minor's] control over his presence unclear." *Id.* at 665. Torkelson argues a marriage is similar because "one ignores the ultimatums of one's wife at one's peril." However, a parent-child relationship is hierarchical, while a marriage involves two adults with equal authority relative to one another. Torkelson's attempt to analogize Carrie's "ultimatum" to demands by police is also unavailing, for the same reason.

683

son to confess and berating him for attempting suicide. Under the circumstances, removing Carrie from the room likely diminished, not enhanced, the pressure on Torkelson to confess.

¶ 23. Finally, Torkelson argues he was in custody because Walrath never told him any differently. However, as explained above, under the totality of the circumstances a reasonable person in Torkelson's position would not believe he was in custody. While an explicit statement might have been a further indication that Torkelson was not in custody, it was not necessary.

## II. The dismissed charges

¶ 24. Torkelson next argues he is entitled to a new trial[6] because the State charged him with exposing genitals or pubic area and child enticement in the same proceeding as a violation of Wis. Stat. § 948.025. Charging the three offenses in the same proceeding was contrary to § 948.025(3). We conclude Torkelson is not entitled to a new trial, for two reasons.

¶ 25. First, Torkelson failed to make a timely objection to the additional charges, and therefore failed to preserve this issue for review. To preserve an alleged error for review, "trial counsel or the party must object in a timely fashion with specificity to allow the court and counsel to review the objection and correct any potential error." *State v. Nielsen*, 2001 WI App 192, ¶ 11, 247 Wis. 2d 466, 634 N.W.2d 325. Here, Torkelson argues the court erred by submitting counts two and three to the jury. Both counts were included in the

---

[6] Torkelson has apparently abandoned his argument that the charging error entitles him to resentencing.

684

original complaint and Information, and Torkelson therefore had every opportunity to object prior to trial. By not objecting, he failed to bring this issue to the attention of the circuit court in time to allow the court to correct the error. *See id.*

¶ 26. Second, Torkelson does not cite any authority for his proposed remedy, and we find none. WISCONSIN STAT. § 948.025(3) simply prohibits the State from charging certain enumerated offenses in the same action as a violation of § 948.025. Nothing in the statute indicates the remedy for a violation is anything other than dismissal of the prohibited charges.[7] In addition, Torkelson does not refute the State's argument that all of the evidence produced on the dismissed counts would have been admissible to prove the sexual assault count. Under these circumstances, Torkelson is not entitled to a new trial.

*By the Court.*—Judgment and order affirmed.

---

[7] Torkelson argues dismissing the charges is an inadequate remedy because it will not deter prosecutors from presenting statutorily barred charges to the jury. However, the barred charges would only reach the jury in cases where defense counsel failed to object. We doubt the legislature had such an unlikely scenario in mind when it drafted WIS. STAT. § 948.025(3). We also doubt it intended to punish the State so severely for an error attributable to both the State and defense counsel.