COURT OF APPEALS
DECISION
DATED AND FILED

August 20, 2020

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2019AP2119-CR**

Cir. Ct. No. **2018CF72**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT IV

STATE OF WISCONSIN,

　PLAINTIFF-RESPONDENT,

V.

NATHAN L. LEOPOLD,

　DEFENDANT-APPELLANT.

　　　　APPEAL from a judgment of the circuit court for Green County: THOMAS J. VALE, Judge. *Affirmed*.

　　　　Before Fitzpatrick, P.J., Blanchard, and Graham, JJ.

　　　　**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM.   Nathan Leopold appeals a judgment of conviction following his no contest pleas to two offenses:  homicide by operation of a motor vehicle, with a detectable amount of restricted controlled substance in his blood; and operating a motor vehicle with a detectable amount of restricted controlled substance in his blood, causing injury.  Leopold argues that the circuit court erred when it denied his motion to suppress two sets of oral statements that Leopold made to the same deputy sheriff after Leopold's vehicle collided with another vehicle, resulting in the death of one person and injuries to another.[1]  Leopold claims that each of his two statements was taken in violation of his Fifth Amendment rights.  The State acknowledges that Leopold's statements were made in response to police interrogations.  The State also acknowledges that, before Leopold made either set of statements, the deputy did not read to Leopold the warnings regarding constitutional rights that police are required to give before custodial interrogations under *Miranda v. Arizona*, 384 U.S. 436 (1966).  But the parties dispute whether these were custodial interrogations.  Thus, the dispositive issue is whether Leopold was in custody within the meaning of *Miranda* during the interrogations.   After considering the totality of the circumstances under governing case law, we conclude that neither of these were custodial interrogations for *Miranda* purposes.  Accordingly, we affirm the circuit court.[2]

---

[1] As explained in the background section below, the second interrogation had two parts. But both parts occurred in the same location (a hospital Emergency Department) and occurred relatively close in time.  Following the parties and for ease of reference, we generally refer to there being two sets of interrogations, not three, and we address the two-part second set in one analysis section.

[2] Because we decide that Leopold's Fifth Amendment rights were not violated during either interrogation, we do not address arguments related to a blood draw to which Leopold consented toward the end of the second interrogation.  More specifically, we do not need to address:  (1) Leopold's argument that the results of blood sample testing must be suppressed based on the alleged *Miranda* violations; (2) the State's argument that police had a sufficient

(continued)

## BACKGROUND

¶2    On October 20, 2017, Leopold was driving a vehicle that collided head-on with another vehicle. The other driver was killed and his passenger was injured. At approximately 6:00 p.m., Deputy Joshua Mayer was among the law enforcement officers dispatched to the crash scene.

¶3    The deputy interrogated Leopold briefly in an ambulance at the crash scene, and Leopold made incriminating statements. Then, beginning approximately 51 minutes later, the deputy interrogated Leopold in a room in the Emergency Department of the hospital to which Leopold was transported by medical personnel. Again, Leopold made incriminating statements, in large part repeating what he had said to the deputy in the ambulance. Both in the ambulance and at the hospital, Leopold was lying on his back wearing a cervical collar while under the care of medical personnel. On both occasions, the deputy took statements from Leopold without first reading him the **Miranda** warnings. We provide factual detail regarding the two sets of interrogations below in the respective subsections of the discussion section of this opinion.

¶4    Leopold moved to suppress his statements from both interrogations. He argued in pertinent part that suppression of both sets of statements is required because both were "made in a custodial context during which Deputy Mayer did

---

basis to request the blood draw absent incriminating statements by Leopold; or (3) Leopold's argument against a potential related argument by the State that the blood sample would inevitably have been lawfully discovered by police.

not provide Leopold the *Miranda* warnings" and in either situation "a reasonable person in Leopold's position would not have considered himself free to leave."[3]

¶5 The circuit court concluded that Leopold was not in custody for purposes of *Miranda* during either interrogation. Leopold entered no contest pleas to two of the charges against him, the court sentenced him, and he now appeals the suppression decisions of the circuit court pursuant to WIS. STAT. § 971.31(10) (2017-18),[4] which permits appeal from denial of a suppression order despite entry of a plea of guilty or no contest.

## DISCUSSION

¶6 For the following reasons, we conclude that Leopold was not in custody for purposes of *Miranda* during either interrogation.

### *Legal Standards*

¶7 We review motions to suppress using a two-step process. *State v. Eason*, 2001 WI 98, ¶9, 245 Wis. 2d 206, 629 N.W.2d 625. "First, we review the circuit court's findings of historical fact, and will uphold them unless they are clearly erroneous." *Id.* "Second, we apply constitutional principles to those facts de novo." *Id.*

¶8 Both the United States and the Wisconsin Constitutions provide protection against compelled self-incrimination. *State v. Martin*, 2012 WI 96, ¶30

---

[3] Leopold does not challenge the voluntariness of his statements.

[4] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

4

& n.22, 343 Wis. 2d 278, 816 N.W.2d 270 (discussing the Fifth and Fourteenth Amendments to the United States Constitution and Article 1, Section 8 of the Wisconsin Constitution). In *Miranda,* the United States Supreme Court interpreted the Fifth Amendment to hold that statements obtained by police during custodial interrogations are not admissible unless, before the interrogation, police inform the individual of his or her right against self-incrimination. *Miranda*, 384 U.S. at 444.

¶9 An individual is in custody for purposes of *Miranda* when he or she "has been taken into custody or otherwise deprived of his [or her] freedom of action in any significant way." *Id.* Courts apply a two-step test. The first step is to determine whether the functional equivalent of a formal arrest occurred:

> A person is in "custody" if under the totality of the circumstances "a reasonable person would not feel free to terminate the interview and leave the scene." "[A] court must examine all of the circumstances surrounding the interrogation, but the ultimate inquiry is simply whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." Several factors have been considered relevant in the totality of the circumstances such as "the defendant's freedom to leave; the purpose, place, and length of the interrogation; and the degree of restraint."

*State v. Lonkoski*, 2013 WI 30, ¶6, 346 Wis. 2d 523, 828 N.W.2d 552 (alteration in original) (citations omitted).

¶10 Before describing the second step of the test, we pause to make an observation about the first step in the context of this case. As referenced above, Leopold was at all pertinent times lying on his back and in the care of medical personnel while wearing a cervical collar. Indeed, as referenced below, at the hospital he was, at least at times, hooked up to monitoring systems. Therefore, unlike in the run of cases assessing custody status for *Miranda* purposes, he was

obviously not in a position to "terminate the interview *and leave the scene*," as referenced in such precedent as **Lonkoski**. In other words, Leopold could not readily leave the scene based on his physical condition and circumstances not created by the police. We discuss the significance of these facts further in our analysis below.

¶11     Turning to the second step of the test, if we determine that police objectively created the functional equivalent of formal arrest, then we determine whether "'the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*.'" **State v. Bartelt**, 2018 WI 16, ¶33, 379 Wis. 2d 588, 906 N.W.2d 684 (quoted source omitted), *cert. denied*, __ U.S. __, 139 S. Ct. 104 (2018). "In other words, we must consider whether the specific circumstances presented a serious danger of coercion, because the 'freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody.'" **Id.** (quoted source omitted). As explained below, we resolve this appeal based on the first step of the test without reaching the second. While many of the same facts would be relevant to the analysis under both steps, we limit our conclusion to the first step.

¶12     The first step is an objective test, meaning that the particular subjective views of neither police officers nor suspects are pertinent to the analysis. **State v. Quigley**, 2016 WI App 53, ¶42, 370 Wis. 2d 702, 883 N.W.2d 139; *see also* **State v. Kilgore**, 2016 WI App 47, ¶22, 370 Wis. 2d 198, 882 N.W.2d 493 (officer's subjective state of mind does not control or influence the issue).

¶13     The first step takes into account the totality of the circumstances, including but not limited to the location, duration, and purpose of the

interrogation, as well as the degree to which the person is or is not restrained. *See Martin*, 343 Wis. 2d 278, ¶35. To evaluate the level of restraint, courts look to whether the individual undergoing the interrogation was placed in handcuffs, frisked, or transported to another location. *State v. Torkelson*, 2007 WI App 272, ¶17, 306 Wis. 2d 673, 743 N.W.2d 511. Other factors that may be useful in assessing the level of restraint include the number of officers involved and whether officers utilized a weapon. *See id.*

¶14 Applying these standards and additional case law, we now address the two sets of interrogations in turn. In providing additional background facts below, we rely on pertinent factual findings made by the circuit court at the suppression hearing, supplemented as needed by undisputed facts. This includes facts reflected on a series of video files (which we will refer to in the singular, as "the video") that were recorded by the body camera worn at all pertinent times by the deputy. Leopold does not challenge any factual finding of the circuit court as clearly erroneous. Portions of the video was played at the suppression hearing. We have reviewed the video, which appears to have high quality images and sound.

*Interrogation In Ambulance*

¶15 Leopold argues that he was in custody for *Miranda* purposes when Deputy Mayer interrogated him in the ambulance. Leopold emphasizes that the deputy had reason to suspect, at the time of the ambulance interrogation, that Leopold had committed violations of law and that the deputy was seeking to obtain admissions from him for prosecution purposes.

¶16 The State contends that the objective factors used to determine whether an individual is in custody for *Miranda* purposes—such as the degree of

7

restraint used by police, the purpose, place, and length of the interrogation, and the content of what the deputy conveyed to Leopold—weigh against that conclusion.

¶17    The following are additional pertinent facts.  After first assisting with traffic control related to the crash, Deputy Mayer was assigned to investigate.  He was told the following by another deputy on the scene:  Leopold's car had crossed the centerline to cause the crash; law enforcement had found in Leopold's vehicle drug paraphernalia (a pipe containing what appeared to be burnt marijuana residue) and a green, leafy, flaky substance suspected to be synthetic marijuana; and Leopold's vehicle had a strong odor of marijuana.

¶18    Still on the scene of the crash, Deputy Mayer approached an ambulance in which Leopold was being attended to by emergency medical personnel.  Leopold was laying on his back on a gurney in the ambulance, wearing a cervical collar.  The deputy asked the medical personnel if he could talk to Leopold.  One responded yes, but said that the deputy needed to "keep it a minute."  Without interfering with the medical attention Leopold was receiving, the deputy climbed into the back of the ambulance and said to Leopold:  "Hey, Nate, we found your pipe and your weed in your vehicle.  When's the last time you smoked?"  The video shows that Leopold responded without hesitation that he had some marijuana in his vehicle and that he had smoked marijuana at 2:00 that afternoon (approximately 4 hours before the crash).

¶19    This interaction in the ambulance lasted 14 seconds.  It occurred entirely in the presence of the medical personnel.  The video reflects both the deputy and Leopold speaking in calm, conversational tones.  The deputy did not give Leopold *Miranda* warnings at any point in this interaction.  The deputy also did not tell Leopold that he was under arrest and did not suggest that the deputy

planned to ride along with Leopold and medical personnel in the ambulance to the hospital.

¶20    Medical personnel transported Leopold in the ambulance to an area hospital. Deputy Mayer drove separately to the hospital.

*Analysis*

¶21    We agree with the circuit court, which concluded the following based on the totality of the circumstances. When the deputy, working as a solo law enforcement officer, calmly interrogated Leopold for 14 seconds in the ambulance, where the defendant had been taken and was being cared for by medical personnel, a reasonable person in Leopold's position would not have understood himself to be under the functional equivalent of formal arrest under the applicable Fifth Amendment case law.

¶22    As the State notes, this is similar to the situation in *State v. Esser*, 166 Wis. 2d 897, 480 N.W.2d 541 (Ct. App. 1992), in which we concluded that brief questioning of the defendant at the scene of a fatal crash was not custodial, in part because his limited mobility was "not the result of any police conduct." *Id.* at 900-02. The court in *Esser* explained that this was an application of the following rule from our supreme court: the circumstances that require *Miranda* warnings must be those caused or created by the authorities. *Esser*, 166 Wis. 2d at 900-02 (citing *State v. Clappes*, 117 Wis. 2d 277, 284, 287, 344 N.W.2d 141 (1984)). In addition, the brevity of the deputy's inquiry weighs against a conclusion that this was custodial interrogation. *See State v. Dobbs*, 2020 WI 64, ¶59, 392 Wis. 2d 505, 945 N.W.2d 609 (citing *Berkemer v. McCarty*, 468 U.S. 420, 437-40 (1984)) ("'A brief detention, such as a traffic stop, typically does not rise to the level of 'custody' for purposes of *Miranda*.'").

9

¶23    Leopold's primary argument regarding the ambulance interrogation misses the mark, because it focuses on the subjective intentions of the deputy, which as we have explained are not pertinent to the analysis.[5]  Leopold attempts to suggest that *Clappes* did not articulate the rule we have just stated in the previous paragraph, but the court was quite clear in the course of extended discussion, including this unqualified statement:  "We now hold that the conditions of custody or otherwise deprivation of freedom requiring *Miranda* warnings to be those caused or created by the authorities."  *See Clappes*, 117 Wis. 2d at 284-87.  Leopold also attempts to distinguish *Esser* based on the nature of the question posed to the defendant in *Esser*, suggesting that the question here called for a more potentially incriminating answer.  But there is no significant difference between the two cases.  The question posed by police in *Esser* (to the effect, "Were you driving your vehicle?") also could have elicited potentially incriminating information.  *See Esser*, 166 Wis. 2d at 900).[6]

---

[5] In particular, Leopold quotes from discussion captured on video among law enforcement on the scene, including Deputy Mayer, regarding their investigative strategies and theories, but none of this is relevant under the objective test.

[6] Leopold makes arguments based on *Scales v. State*, 64 Wis. 2d 485, 219 N.W.2d 286 (1974), that are not viable, given the manner in which the court in *State v. Clappes*, 117 Wis. 2d 277, 344 N.W.2d 141 (1984), distinguishes *Scales*.  *See also State v. Prado*, 2020 WI App 42, ¶59 n.20, __ Wis. 2d __, __ N.W.2d __ (citing *Birchfield v. North Dakota*, __ U.S. __, 136 S. Ct. 2160, 2185 (2016)) (noting that a decision of the United States Supreme Court now precludes reasoning in *Scales* regarding blood draws that we need not address here).  The court in *Scales* stated that *Miranda* warnings had to be given to an injured defendant in the hospital, because under the circumstances he "was as effectively bound to his bed as if he had been shackled to it." *Scales*, 64 Wis. 2d at 492.  However, as we note in the text, the approach of the court in *Clappes* is to focus on the degree to which such "binding" or "restraint" was "created by the [police] authorities."  The *Clappes* court faults *Scales* for "not stress[ing] the entire language of the United States Supreme Court stating 'when an individual is taken into custody or otherwise deprived of his freedom *by the authorities* in any significant way and is subjected to questioning.'"  *Clappes*, 117 Wis. 2d at 285 (quoting *Miranda*, 384 U.S. at 478 and adding the emphasis to the *Miranda* language).

¶24     Leopold argues that the State fails to take into account the relevance of the deputy's purpose in interrogating him, and that the video reveals a purpose to collect evidence for use in a prosecution case against him.  But Leopold rests this argument in part on *State v. Blatterman*, 2015 WI 46, 362 Wis. 2d 138, 864 N.W.2d 26, which interprets the concept of custody in the Fourth Amendment context, not in the Fifth Amendment context.  As our supreme court recently had occasion to note in the determination-of-custody context, "the Fourth Amendment and Fifth Amendment protect different interests and involve different inquiries." *Dobbs*, 392 Wis. 2d 505, ¶57.  The Fourth Amendment is a reasonableness inquiry that balances "the government's interest in crime prevention against an individual's right to be free from government intrusion." *Id.*  In contrast, the Fifth Amendment protects "the right not to be compelled to incriminate oneself." *Id.*, ¶58.

¶25     To clarify, one factual premise of Leopold's argument is not unreasonable.  The deputy's question in the ambulance, viewed objectively, revealed an obvious purpose to collect evidence against Leopold.  No doubt, it sought to elicit an answer that could have been used as part of a basis to place him under formal arrest.  However, Leopold fails to develop an argument, based on Fifth Amendment jurisprudence, that this fact is entitled to significant weight here given other relevant facts, such as the brevity and low key nature of the interrogation and the lack of any use or threats of restraint by the deputy.  Without delving more deeply into this topic, it is sufficient to explain that Leopold fails to persuade us that our guidance here should be found in *Blatterman*, and not in *Clappes* and *Esser*, and it is also sufficient that under similar circumstances in *Esser* there was also an objectively obvious police purpose to collect potentially incriminating evidence.

¶26     Leopold briefly suggests that it reasonable for him to "expect that he would be taken into custody on a probation hold" because he was under probation supervision at the time of the crash. However, the deputy and Leopold had no discussion about his probationary status. Further, even if they had, Leopold fails to develop an argument that, given all of the other circumstances here, the probation topic would have carried any weight in the analysis.

*Interrogation At Hospital*

¶27     Leopold argues that he was in custody for ***Miranda*** purposes when Deputy Mayer interrogated him at the hospital. He emphasizes that the deputy had already obtained incriminating admissions from Leopold in the ambulance and had also already prepared the citations to give him before interrogating him in the hospital. The State again contends that the objective factors used to determine whether an individual is in custody for ***Miranda*** purposes weigh against that conclusion.

¶28     By the time the deputy was driving to the hospital, he planned to cite Leopold for possession of drug paraphernalia, operating while intoxicated, and operating left of the center lane. Toward that end, the deputy printed out citations for those offenses in his squad car. He planned to obtain more information from Leopold at the hospital before issuing the citations to Leopold, but he took the citations with him when he went into the hospital. The deputy knew that Leopold was on probation but did not contact his probation officer until after Leopold was placed under arrest.

¶29     Inside the hospital, the deputy received permission from medical personnel to walk back to the room where Leopold was within the Emergency Department. The deputy pulled aside a curtain to enter a room with three walls, a

curtain, and a door, where Leopold was lying on his back on a hospital bed, wearing a hospital gown and a cervical collar; he was also attached to some monitoring equipment. There were several nurses also present, who gave the deputy permission to be in the room.[7]

¶30 Approximately 51 minutes after the 14-second interaction between the deputy and Leopold in the ambulance, the deputy identified himself to Leopold. Leopold calmly acknowledged this identification without asking any questions of the deputy. The deputy informed Leopold that, based on what law enforcement had found in Leopold's car, the deputy was seeking more information.

¶31 The deputy said that he would "need to search [Leopold's] clothing," which was sitting on a chair nearby. Leopold indicated his assent.[8] The deputy briefly looked through Leopold's clothing, including noting that there was a wallet in the pants. The deputy also asked Leopold again about his possession of

---

[7] The body camera on Deputy Mayer's chest, which naturally reveals only images in front of the deputy, shows various medical personnel coming and going at various times during the two-part hospital interrogation. This includes medical personnel wheeling Leopold out of the room and to go elsewhere in the hospital for 46 minutes. It seems very likely that a theoretical 360-degree view around the deputy would have revealed more activity by medical personnel. For purposes of our analysis, it is sufficient to note that the video establishes that Leopold was under medical care throughout, that medical personnel were sometimes present, and that the deputy did not appear to interfere with their work in any way.

[8] In his principal brief, Leopold asserts that the search of the clothing was "unauthorized," and this forms a significant portion of his argument that the rule stated in *Clappes* does not apply here. It was also the understanding of the circuit court that Leopold did not consent to a clothing search. However, the State points out that a video reflects that Leopold nodded and said, "Yeah, that's fine," in response to the request search is clothing. In his reply brief, Leopold implicitly concedes the factual point, but characterizes Leopold's conduct as "acquiescence rather than voluntary consent." This concession significantly weakens Leopold's original argument. Further, the deputy's search of the clothing was brief and seemingly uneventful.

marijuana and the last time he had smoked, and Leopold again admitted possessing marijuana and repeated his earlier statement, this time saying that he had taken "one hit" on the pipe at 2:00.

¶32 The deputy said, "Based on what we observed in the vehicle and your admission that you were smoking weed today, I'm going to request that you submit to field sobriety." The video reflects that Leopold responded, "sure," without hesitation or asking any questions. The test began with discussion about the nature of the test and then with initial testing, with which Leopold was completely cooperative. Then medical personnel came to take Leopold away for what they explained could be up to an hour of treatment elsewhere in the hospital.

¶33 Approximately 46 minutes later, medical personnel returned Leopold to the room, where the deputy had been waiting. The deputy asked Leopold if it would be okay to resume the sobriety testing and Leopold indicated his agreement to cooperate. Before resuming the field sobriety testing, the deputy engaged Leopold in additional questioning that resulted in Leopold saying that he had consumed two beers at supper at five p.m. There was more discussion of marijuana, with Leopold saying again that he had taken "one hit" on a "full" pipe at 2 p.m.

¶34 The deputy asked if he could resume the field sobriety testing, Leopold indicated his agreement by nodding his head, and the deputy performed tests for approximately four minutes.

¶35 To this point in the hospital interrogation, the deputy had not read the *Miranda* warnings to Leopold and had not told Leopold that he was free to leave. On the other hand, Leopold did not object to the deputy being present or to questioning him, and the deputy did not do anything that restrained Leopold's

14

freedom of movement. For example, the deputy did not use handcuffs on Leopold or otherwise constrain him. The deputy also had not told Leopold that he was under arrest nor had he issued any citations to him, or even referred to the citations.

¶36 About five minutes after medical personnel returned Leopold back to the room where the deputy had been waiting, as Leopold again lay on a hospital bed in the same room, the deputy explained that he was going to issue him a citation for operating while intoxicated, which "will be amended in court to a fatal, OWI causing fatal injury."

¶37 Leopold expressed initial confusion about the reference to a fatality and the deputy explained that the driver of the other vehicle was deceased. Leopold said, "Oh, no."

¶38 The deputy finished explaining the three citations and stressed that Leopold had a mandatory court appearance at an identified time and place in December. The deputy asked if Leopold had any questions about the citations and Leopold indicated no. Leopold asked, "A person died?" and closed his eyes.

¶39 The deputy read to Leopold from the "informing the accused" form and Leopold consented to a blood draw and blood was drawn. This process included the deputy asking Leopold to initial and sign a form, which Leopold did without question or complaint. The deputy then worked with a medical professional who drew the blood and the two worked together to package up the blood vials as evidence. As part of this process, the deputy asked Leopold for permission to remove Leopold's driver's license from his wallet to note information from it; Leopold gave his permission, and the deputy wrote down information from the license and then returned it to the wallet.

¶40 After finishing the blood draw paperwork, the deputy asked Leopold if he would answer questions for an "alcohol drug influence report." For the first time in their interactions that evening, Leopold did not promptly respond to a question or agree to a request for cooperation by the deputy. Leopold said that he would not answer these questions. The deputy said he would read the pre-interrogation *Miranda* warning to Leopold, even though the deputy explained that he knew Leopold would have said he did not want to answer further questions. After that occurred, the deputy said, "that's all I have for you," summarized that he had left the citations for Leopold and reminded Leopold again that he needed to appear for his mandatory court date. The deputy ended the hospital encounter by saying "thank you" to Leopold as he walked out.

¶41 The State contends that, throughout his interactions with Leopold at the hospital, as during their ambulance interaction, the deputy was "cordial and non-aggressive," and Leopold does not dispute that contention.

*Analysis*

¶42 For the following reasons, we agree with the circuit court that, under the totality of the circumstances, a reasonable person in Leopold's situation would not have understood himself to be in custody, under the applicable Fifth Amendment case law.

¶43 The location, duration, and restraint factors all weigh in favor of the State's arguments. In terms of location, he was interrogated in the neutral setting of a hospital to which he had been transported by medical personnel, with medical personnel freely coming and going from the hospital room. *Cf. Clappes*, 117 Wis. 2d at 287 ("[p]olice station interrogation carries a strong presumption of custody"). There is no suggestion that the deputy interfered with medical

16

personnel or attempted to enlist them to assist in any coercion of Leopold. In terms of duration, excluding the 46-minute interruption for medical treatment, the interrogation was relatively short and the deputy simply made use of time when Leopold was not being treated. Turning to the restraint used, Leopold was not handcuffed or otherwise restrained by the deputy. Also, the deputy was the only member of law enforcement at the hospital, just as he had been the only law enforcement officer to interrogate Leopold at the ambulance. The deputy acted in a low key and courteous manner, as he had at the ambulance, and he did not draw any weapon or otherwise make any threat or display of force. None of the statements or actions of the deputy shown in the video appears to be commanding or controlling. The deputy's manner and questions would have conveyed to the "reasonable person" whom we are to imagine under applicable Fifth Amendment case law that Leopold had autonomy in this situation and that his preferences would be respected. Leopold decided to terminate the interrogation when he did based on his own subjective views in the moment; a reasonable person would have known that he or she had been free to do so at any earlier point.

¶44 For two separate reasons, it does not matter that the deputy had printed out the citations in advance and planned to issue them to Leopold after concluding the hospital interrogation. First, as summarized above, the subjective plan or intentions of law enforcement are irrelevant. Second, given the circumstances, it is not clear that, even if Leopold had been aware that the deputy was going to issue citations to him, this should have signaled to Leopold that he was in custody.

¶45 It is true that Leopold had admitted to law violations to the deputy in the ambulance interview: marijuana use in advance of driving and a vehicle crash, and possession of paraphernalia. Leopold now argues that this made him "an

17

inevitable criminal defendant" and therefore a reasonable person would not feel free to terminate the interrogation. However, "although an admission of guilt to a serious crime is a factor to consider in a custody analysis," such an admission is not necessarily "enough to transform [the interrogated person's] status to that of 'in custody' given the totality of the circumstances." *Bartelt*, 379 Wis. 2d 588, ¶53. The facts in *Bartelt* were considerably more dramatic than the facts here and the discussion in *Bartelt* suggests that this factor is entitled to some weight, but not significant weight, in the instant context. *See id.*, ¶¶9-15, 46-53 (determining that defendant was not in custody, despite the fact that, while being interrogated at a police station in an increasingly accusative fashion, he confessed to physically assaulting a woman in a park).

¶46    The deputy appears not to have told Leopold that he could terminate the interrogation at any time, which in itself weighs in favor of Leopold's arguments. At the same time, however, the deputy specifically inquired, on several separate occasions, whether Leopold would agree to participate in field sobriety testing and Leopold indicated yes each time, and the deputy also asked for permission to search his clothing and to have medical personnel take a blood draw. These were all indicia that Leopold could make independent choices in his interactions with the deputy and that the deputy would respect those choices. Considering the totality of the circumstances, applying the pertinent Fifth Amendment case law, we conclude that a reasonable person would have felt free to terminate the interrogation at the hospital.

¶47    In sum, under the totality of the circumstances both in the ambulance and at the hospital, we conclude that Leopold was not in custody under applicable constitutional standards. Therefore we do not need to reach the second step of the test, whether "the relevant environment presents the same inherently coercive

18

pressures as the type of station house questioning at issue in *Miranda*." *See Bartelt*, 379 Wis. 2d 588, ¶33.

   *By the Court*.—Judgment affirmed.

   This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.